## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO:  03-81087CIV-HURLEY

SAMUEL D. LAFORTE & NANCY
M. LAFORTE,

Plaintiffs,

v.

UNIVERSAL HEALTH SERVICES,  INC.
d/b/a, WELLINGTON REGIONAL MEDICAL
CENTER, HARVEY MONTIJO, M.D., individually,
AND INTEGRATED HEALTH SERVICES AT
WEST PALM BEACH, AND THE CENTER FOR
BONE & JOINT SURGERY OF THE PALM
BEACHES, P.A.

Defendants.

_____ /

---

# PLAINTIFF'S OPPOSITION BRIEF TO DEFENDANT
# WELLINGTON REGIONAL MEDICAL CENTER, INC.'S
# MOTION TO DISMISS OR STRIKE

---

Clara R. Smit, Esq.
Turnpike Metroplex
190 Highway 18  Suite 200
East Brunswick NJ 08816
(732) 843-6600

## PRELIMINARY STATEMENT

This action is brought by plaintiffs Samuel D. Laforte and Nancy M. Laforte. Mr. and Mrs. Laforte are profoundly deaf and communicate primarily in American Sign Language. Plaintiffs allege that defendant hospital failed to ensure effective communication with them during medical treatment provided to Samuel Laforte in three separate hospitalizations, in violation of their civil rights under §504 and the ADA. Mr. Laforte underwent multiple procedures and treatments including two very serious total hip replacements and diagnostic surgeries during a bleeding incident. Yet despite documented notations in the records that communication was difficult and requests by plaintiffs for sign language interpreters they required,  defendant hospital failed in any hospitalization to obtain a qualified interpreter at anytime.

Defendant  now seeks to dismiss plaintiffs' complaint in it's entirety. Plaintiffs strenuously oppose defendant's motion under §504 and the ADA as plaintiffs' claims are meritorious.

## STATEMENT OF FACTS

Plaintiffs, Samuel D. LaForte and Nancy M. LaForte are profoundly deaf and communicate primarily through American Sign Language. As such the plaintiffs cannot lipread nor verbalize in an understandable manner. Their ability to communicate through reading and writing is extremely limited as they communicate in ASL which is a foreign language and not based upon English. (See a true copy of Plaintiffs' Complaint attached as Exhibit A)

Plaintiff Samuel LaForte was seen by Dr. Harvey Montijo prior to his surgery to his right hip and hospitalization at Wellington Regional Medical Center. Plaintiffs requested an interpreter from Dr. Harvey Montijo but none was provided. Dr. Harvey Montijo further told plaintiff that Wellington Regional Medical Center would not provide an interpreter and he would have to write back and forth or use their friend Carmel Celestino. No interpreter was ever provided to the plaintiffs by Dr. Harvey Montijo.(See a true copy of Plaintiffs' Complaint attached as Exhibit A)

Plaintiff Samuel LaForte thereafter went to Wellington Regional Medical Center on January 22, 2002 for a total right hip replacement.  An interpreter was again requested directly from the hospital and none was provided by the defendant hospital. During this hospitalization, plaintiffs requested an interpreter and the hospital stated they only have "foreign language interpreters and not sign language interpreters". The plaintiffs were then forced to utilize and pay a hard of hearing friend, Carmel Celestino to assist in interpreting for him and his wife. Ms. Celestino was there only a short period and was ineffective but

plaintiffs had no other options as the hospital failed to provide a Sign Language interpreter and effective communication. Thus, effective communication did not take place and plaintiffs were left with no real understanding as to what took place prior to, during and after Samuel LaForte's surgery. (See a true copy of Plaintiffs' Complaint attached as Exhibit A)

Subsequently plaintiff Samuel LaForte returned to Wellington Regional Medical Center on October 16, 2002 through October 18, 2002 for a total left hip replacement. Once again an interpreter was requested and none was provided by the defendant hospital. Prior to his hospitalization, plaintiffs were concerned and worried as no interpreter had been provided during the first surgery and in the days thereafter. In hopes of preventing a repeat of their first terrifying experience where they did not understand much of what was happening they then contacted a local agency, Deaf Services to try to advocate for them with the hospital to ensure that the hospital met it's obligations during this hospitalization.

Beth Bystrycki of Deaf Services then contacted the hospital to advise of plaintiff Samuel LaForte's upcoming surgery and that he needed an interpreter to be arranged by the hospital. Beth Bystrycki further provided the hospital with names and telephone numbers of interpreters to contact to arrange for a sign language interpreter for the plaintiffs. (See a true copy of Certification of Beth Bystrycki attached as Exhibit B) Despite this, when Plaintiffs arrived at the hospital they were once again advised that the hospital did not have any sign language interpreters and did not arrange any for the surgery or thereafter. The hospital also failed to provide notice of any communication options. Thus, plaintiff

Samuel LaForte was once again forced to undergo serious invasive procedures, testing, treatment, admission and discharge procedures, all without truly being able to understand and effectively communicate.  Mrs. Laforte was also unable to understand much of the treatment her husband underwent and was unable to ask many questions about his care as any other nondisabled spouse would have. (See a true copy of Plaintiffs' Complaint attached as Exhibit A)

Plaintiff, Samuel LaForte then returned again to  Wellington Regional Medical Center on October 23, 2002 through October 25, 2002 for bleeding following his surgery. Once again, despite his very serious medical condition and further invasive surgeries(esophagogastroduodenscopy and colonoscopy), defendant failed to obtain an interpreter and to ensure effective communication with these individuals who were profoundly deaf and communicated in sign language. Defendant  acknowledged  in the medical records  that Samuel LaForte was deaf and that "the history is somewhat limited due to the fact that he is deaf and mute" (See Plaintiffs' Exhibit C, a true copy of some of the relevant pages of the Medical Records of Plaintiff, Samuel LaForte) Yet they apparently made no efforts to obtain interpreters.  Finally in desperation and frustration as they once again were not able to communicate,  plaintiff told the nursing supervisor he wanted to leave as there had been no interpreter and no effective communication and he was permitted to leave. Plaintiffs had been given no interpreter and no explanation when they left the hospital as to what had caused his bleeding and what his prognosis and treatment should be. No doctor ever came to discharge Mr. LaForte.

During all hospitalizations and therapy sessions, plaintiffs repeatedly requested that an interpreter be provided. They also requested closed captioning (cc) and a TTY (telecommunication device for the deaf to communicate via telephone). Yet no qualified interpreter, TTY or cc was ever provided by the defendant despite repeated requests made by plaintiffs. Defendants failed to effectively communicate with plaintiffs and to provide auxiliary aids for their disability to ensure same as required by federal and state law. (See a true copy of Plaintiffs' Complaint attached as Exhibit A and a true copy of a handwritten notes by Plaintiff, Samuel LaForte requesting an interpreter, TTY and closed captioning attached as Exhibit D)

Without any effective communication between the Defendant and the Plaintiffs, the Plaintiffs did not completely understand what treatment was being provided or what procedures were being performed.  The Plaintiffs were unable to effectively ask questions or voice concerns regarding risks or benefits of recommended produces and treatments. The only communication that defendant attempted was through brief cursory notes on the rare occasions a doctor, nurse or staff member would bother to try communicate at all with either Mr. Laforte or Mrs. Laforte. Yet even in the few notes which were written, the responses from plaintiffs were either nonexistent or brief one word answers were given which do not show real understanding. (See Plaintiffs' Exhibit E, a true copy of handwritten notes).   During most of the three hospitalizations there were no attempts to effectively communicate with the plaintiffs directly due to their disabilities and defendant's failure to accommodate their disability.

-o-

During the periods of time that Plaintiff, Samuel LaForte was under the care of the Defendant, he was required to undergo all kinds of treatment and care which he could not understand or ask questions about. Plaintiffs were not told of any of the risks involved nor benefits so they could weigh any possible choices between procedures. The Plaintiff Samuel LaForte signed the forms presented to him because he feared for his health and safety and felt that he had no options because no effective communication was being provided. Plaintiffs were unable on many occasions during Samuel LaForte's treatment and care to fully understand what was going on and often no attempts were even made to try to help them understand what was going on. Plaintiffs were never provided with an interpreter by Wellington Regional Medical Center which they required for effective communication and Wellington knew this yet none was ever provided. Indeed defendant noted in the medical records that plaintiffs were deaf and that they needed an interpreter from the first hospitalization yet none was ever obtained during any of the three admissions. It is written "Deaf-needs interpreter" on Plaintiff Samuel LaForte's Consent Form for his surgery of his right hip from January of 2002. (See Exhibit A, a true copy of Plaintiffs' Complaint and see also a true copy of Consent Form attached as Exhibit F)

This case then involves very serious allegations with a great variety of serious repercussions for the deaf plaintiffs as well as the deaf community at large in the Florida area.

Plaintiffs have filed this lawsuit under the Florida Civil Rights Act of 1992, Fla. Stat. §760.01 et seq, the Americans with Disabilities Act, Title II, 42 USC §12131 et seq and Title

III, 42 USC §12181 et seq and the Rehabilitation Act, 29 USC §794, Section 504  along with common law causes of action.

## POINT ONE

## DEFENDANTS HAVE AN AFFIRMATIVE OBLIGATION

## UNDER §504 AND THE ADA

## TO PROVIDE AUXILIARY AIDS WHEN

## REQUIRED TO PROVIDE EQUAL ACCESS

Initially defendant argues that this a medical malpractice case and therefore plaintiffs' claims are barred as the complaint does not comply with Florida Statutes chapter 766 and the defendant hospital is not liable for a failure to obtain informed consent. The argument made by defendant in this point is totally without merit. In making this argument, Defendant completely misses the meaning of plaintiffs' claims. This claim is not a  medical malpractice claim; it is a case in which plaintiffs were denied <u>equal access</u> to their own and their loved ones' medical care and treatment. They were denied this access, this ability to meaningfully participate in, understand, ask questions and make decisions, directly due to defendant's failure to ensure effective communication and discrimination due to plaintiffs' disability.

Wellington Regional Medical Center is under an absolute duty to **ensure** effective communication takes place while providing benefits, services and treatment to the disabled and that communication with the disabled is equal to that of communication with the nondisabled under all applicable antidiscrimination statutes and regulations implementing same. 29 U.S.C. §794(a), 42 U.S.C.(c) 12101,  45 C.F.R.§84.52, 28 C.F.R. §36.303(c) The claim

-9-

for effective communication does not refer to the treatment itself but rather the exclusion from **meaningful** participation in the medical decisions. <u>Aikens v. St. Helena Hospital</u> 843 F.Supp. 1329 (D.C. Calif. 1994). Further Wellington Hospital has an absolute obligation to ensure that the participation and understanding of medical treatment of disabled patients is not limited because of their failure to provide auxiliary aids and that notice of all communication options is provided to the plaintiffs. Yet during all of the plaintiffs' three hospital admissions to this hospital, no effective accommodations were provided such as qualified interpreters, telecommunication device for the deaf, or closed captioning nor was any notice of communication options given to plaintiffs. [1]

The law is clear. The defendant's obligation to ensure effective communication is not limited in any way under the Rehabilitation Act or the ADA. Even the existence of some sort of policy is meaningless, if it is not followed.(See <u>Aikens,</u> id, "one cannot infer even from the fact that  defendant had a policy that it communicated effectively with the deaf plaintiff at <u>all</u> times.") The applicable regulations state that **even in emergency situations, defendant must ensure effective communication.** 45 C.F.R. §84.52. The regulations further

_____

[1]  28 C.F.R. §36.303(c) of the Act requires "a public accommodation shall furnish appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities. Examples of aids are listed as: Qualified interpreters, note takers, computer-aided transcription services, written materials, telephone handset amplifiers, assistive listening systems, telephones compatible with hearing aids, closed caption decoders, open and closed captioning, telecommunications devices for deaf persons (TDD's), Videotext displays, or other effective methods of making aurally delivered materials available to individuals with hearing impairments. (b)(1)28 C.F.R. §36.303.  This list is not meant to be all-inclusive or exhaustive.

provide that auxiliary aids must be provided to ensure this effective communication and equal access to services by defendant which include qualified interpreters, closed captioning and TDDs . Further that notice of communication options must be provided to those with hearing impairments. 45 C.F.R. §84.22(f) and OCR's Position Paper on the provision of Auxiliary Aids for Hearing Impaired Patients in Inpatient, Outpatient and Emergency Treatment Settings, "Health care providers have an obligation to insure that timely notice is given to hearing impaired persons seeking treatment of the range of communication options that the recipient offers".(A true copy of OCR,s Position Paper is attached as Exhibit G) When the defendant hospital failed to provide an **effective** means of communication, or other auxiliary aids as well as notice to the plaintiffs during medical treatment at Wellington, it discriminated against them in violation of the ADA, §504 of the Rehabilitation Act and Fla.Stat.§760.07.

It is essential then, that this issue, the true gravamen of this case, is considered when analyzing the claims in this case. When defendant argues that this is a medical malpractice informed consent case, they seriously misunderstand the nature of this case. A similar case serves as an example. Mrs. Aikins, the deaf wife of a patient rushed to an emergency room, claimed that the hospital's failure to provide her a sign language interpreter violated § 504. Aikins v. St. Helena Hospital, 843 S. Supp. 1329 (N.D. Ca. 1994). In its motion the hospital claimed that it had complied with § 504 as a matter of law because "Mr. Aikins received precisely the same treatment he would have received had Mrs. Aikins not been deaf." Id. At 1338. The court, however, found that the hospital's argument missed the point. Mrs.

Aikins claim involved the "exclusion from meaningful participation in the decisions affecting her husband's treatment, not [ ] the appropriateness of the treatment itself." Aikens, id at 1338.[2] The court further stated it was "precisely the plaintiff's disability that caused defendants to communicate with her in an allegedly inadequate manner". Aikins id at 1338. Also See Negron v. Snoqualmie Valley Hospital and Overlake Hospital,936 P.2d 55 (Wash.Ct. Of App.Div. I 1997), Bravin v. Mount Sinai Med. Ctr;186 F.R.D. 293(S.D.N.Y) vacated on other grounds; 58 F.Supp.2d 269, (S.D.N.Y. 1999); Proctor v. Prince George's Hosp. Ctr. 32 F. Supp. 2d(D.Md 1998), and Chisolm v. Mercer County Detention Center et al, 97 F.Supp. 2d 615(U.S.D.Ct NJ 2000) reversed at 275 F.3d 315,(3rd Cir.2001).There was no issue of medical malpractice in any of these cases.  Specifically see Borngesser v. Jersey Shore Medical Center, 340 N.J.Super.369, 373 (App.Div. 2001)

"Effective Communication" is mandated by Section 504 and Title II. This has been interpreted by our courts to require that the knowledge, thoughts, and opinions are successfully conveyed between patients and medical staff and that the deaf patient.  This can be further interpreted to mean that the deaf patient " actually understood" the content of the communication. See Borngesser v. Jersey Shore Medical Center, id at 373 citing Elizabeth Chilton, Note, Ensuring Effective Communication: The Duty of Health Care Providers to Supply Sign Language Interpreters for Deaf Patients, 47 Hastings L.J. 871; 871, 882-82(1996).  This was lacking during all three of the disabled plaintiffs' hospitalizations.

---

[2]The court was very careful to distinguish that this was not about informed consent since the treatment rendered was emergency treatment which vitiated the obligation to obtain informed consent but about Mrs. Aiken's right to understand all of the treatment provided.

Clearly this is not a case of medical malpractice but instead one of discrimination and whether or not effective communication occurred in violation of federal and state discrimination laws which do not require presuit procedures. This claim does not fall within Chapter 766, thus the presuit procedures mandated do not apply.

<u>POINT TWO</u>

<u>PLAINTIFFS HAVE STANDING UNDER THE ADA</u>

<u>AND THEREFORE STATE A CLAIM FOR RELIEF</u>

Plaintiffs state a valid claim for injunctive relief, attorneys fees and costs under the ADA. Initially defendants once again attempt to characterize this case as a medical malpractice case in that Mr. Laforte was not able to give informed consent for his surgeries and treatment.  Defendants then state that this obligation is that of the doctor's not the hospital's so they are not responsible for same. However once again this case is not about the medical treatment itself; plaintiffs do not allege they would not have consented to the procedure had they known and understood all of the benefits and risks of the procedures performed.  Instead plaintiffs' claims arise from the hospital's failure to ensure effective communication and to provide auxiliary aids such as sign language interpreters as is their absolute obligation under federal and state anti-discrimination laws. Once again there is no issue in this case of medical malpractice or of inadequate care.  See <u>Aikens,</u> supra, <u>Borngesser,</u>supra , 373.

Thus defendant's argument that Mrs. Laforte has no standing under the ADA because Mr. Laforte was competent to give informed consent is of no consequence to this case. Furthermore as the spouse of a patient Mrs. Laforte had associational claims and standing in her own right to understand, participate in and ask questions about her husband's medical care just as any other nondisabled family member would which

transcend informed consent. 42 U.S.C. § 12182(b)(1)(E).[3]   Indeed the few notes that the

hospital employees bothered to write show that they were attempting to communicate with

her.  (See Plaintiffs' Exhibit E). As such they had an absolute obligation to do so in a

nondiscriminatory manner.   Interestingly in <u>Aikens</u>, supra, the case defendant cites to,  the

wife did not have to provide consent as her husband's care was done on an emergency

basis,  however  once  they  undertook  to  communicate  with  her,  they  had  to  so  in  a

nondiscriminatory manner and to ensure effective communication. In addition, as the court

noted  in <u>Aikens</u>, supra,  the claims of plaintiffs far exceed just the informed consent forms

but instead span the entire hospitalization periods and whether effective communication

took place during all of the hospitalization.  This is exactly the same in this case thus Mrs.

Laforte clearly has standing.

     Next defendant asserts that both plaintiffs do not have standing for injunctive relief

under Title III as they do not allege a real or immediate threat.  Defendants correctly state

_____

[3] Title III of the ADA unequivocally provides:
     (E)  ASSOCIATION. - It shall be discriminatory to exclude or otherwise deny
equal goods, services, facilities, privileges, advantages, accommodations, or other opportunities
to an individual or entity because of the known disability of an individual with whom the
individual or entity is know to have a relationship.
     Similarly the  Rehabilitation Act of 1973 or §504 states that "no individual in the United
States... shall solely by reasons of her or his disability be excluded from the participation in, be
denied the benefits of, or be subjected to discrimination under any program or activity receiving
federal financial assistance". 29 <u>U.S.C.</u>Section 794(a). Further the statutory language under
Section 504 is clear, *"any* **person aggrieved** by any act or failure to act by any recipient of
Federal  assistance or Federal provider of such assistance under section 794 of this title" may
pursue appropriate remedies such as injunctive relief and money damages. <u>See</u> 29 U.S.C. §
794a(a)(2)(emphasis added).

the applicable law regarding standing to assert a claim for injunctive relief under the ADA. However defendants erroneously apply it to the facts of the instant case.

In cases in the past involving deaf patients and hospitals, courts have dismissed their claims for injunctive relief, however these dismissals are often without prejudice, with leave to amend. The claims were only dismissed due to technical errors in the pleadings not the facts.(See Aikins v. St. Helena Hospital 843 F.Supp.1329,(N.D. Cal. 1994), Schrodel v. NYU Medical Center, 4 A.D. Cas.(BNA)619,624 (S.D.N.Y. 1995), and Naiman v. New York University Hospital, 6 A.D. Cas.(BNA)1345,1348,10 NDLR ¶39(S.D.N.Y. 1997). In point of fact, the plaintiffs in two of the cases did in fact amend their complaints to reflect the "magic" words, that they would use the defendant hospital in the future. (See Aikins v. St. Helena's Hospital, 6 NDLR ¶129(N.D.Cal. April, 1994 attached as Exhibit H). The claims for injunctive relief in both of these cases were reinstated. In Schrodel, the plaintiff elected not to amend her complaint thereafter.

In Aikins, the plaintiff amended her complaint to state that she "visited her mobile home near the hospital several times a year and considered it reasonably possible that she might need to seek services from the hospital again and that defendants were engaged in a "pattern and practice of violating" the anti-discrimination laws which ensure access to services by deaf people." Aikins, id at page 7. The court found this sufficient for standing purposes.

Further in Tuggv. Towey, a case in the southern district of Florida, individuals who were deaf who received mental health counseling, as well as hearing members of their

families, were found to have standing for preliminary injunctive relief, based upon the state department of rehabilitative services' past history of discrimination and the fact that it was likely to happen again. 864 F.Supp.1201(SDFla.1994).

Recently a deaf patient's claim for injunctive relief has even been extended to a doctor's office where the plaintiff never actually visited the defendant doctor but was told an interpreter would not be provided for an office visit. In Majocha v. Turner, 166 F.Supp.2d 316,(W.D.Pa 2001). the district court in the W.D. of Pennsylvania determined that the plaintiff had standing where a public accommodation in the health care field adheres to its policies of refusing to provide the requested auxiliary aid. Also see Mayberry v. Von Valtier, 843 F.Supp. 1160(E.D Mich. 1994). and  Dudley v. Hannaford Bros.Co., 146 F.Supp.2d 82(D.Me.2001).

In the instant case the plaintiffs went to the defendant hospital three times in one year for admissions spanning several days. Further unlike in Aikins, plaintiffs in the instant case actually reside close to the defendant hospital(as compared to visiting a mobile home in the area) and therefore are much more likely to have to use the hospitals again and again in the future. Thus the failure of the defendant to have an adequate policy in place to ensure effective communication with those who are deaf will pose a real threat to these plaintiffs.

Plaintiffs here have pleaded sufficient facts to demonstrate that there is a "real and immediate threat" that they would have to use the hospital in the future and would be denied a qualified interpreter in violation of the law. Therefore they clearly have standing to seek injunctive relief against the defendant hospital.

## POINT THREE

### PLAINTIFFS STATE A VALID CLAIM UNDER §504

Defendant next argues that plaintiffs' claims under §504 of the Rehabilitation Act should be dismissed as they do not state a claim upon which relief may be granted. Defendant first argues that plaintiffs' claim are precluded because the only relief available under §504 is injunctive relief and therefore their same arguments under the ADA apply.

In arguing that compensatory damages are unavailable as a matter of law for claims brought pursuant to § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, defendants ignore not only Supreme Court case law which reaches the opposite conclusion, but also the decisions of the U.S. Courts of Appeals and numerous federal district courts, including Florida's own Eleventh Circuit, which have adhered to the longstanding principle that "where legal rights are invaded, federal courts may use any available remedy to make good the wrong." Bell v. Hood, 327 U.S. 678, 684 (1946).

In Franklin v. Gwinnett County Public Schools, the Supreme Court reiterated this traditional rule by stating unequivocally that, "absent clear direction to the contrary by Congress,[4] the federal courts have the power to award any appropriate relief in a cognizable cause of action brought pursuant to a federal statute." 503 U.S. 60, 70-71 (1992). This principle, that courts will "presume the availability of all appropriate remedies," has been

---

[4]By contrast under the ADA Title III, Congress specifically excluded damages and only provided for injunctive relief. This was not done under §504 which is why the courts have traditionally always found that $504 provides for damages.

the "prevailing presumption in our federal courts since at least the early nineteenth century." Id. at 71-72.

Following this rule there have been a plethora of cases in which damages have been found to be an available remedy under the Rehabilitation Act. The United States Supreme Court upheld the award of compensatory damages under §504 and Title II of the ADA in Barnes v. Gorman, 536 U.S. 181, 122 S.Ct.2097 (2002) just two years ago.  Further the Eleventh Circuit itself found over ten years ago that damages were available under the Rehabilitation Act. In Waldrop v. Southern Company Services, Inc., the court noted that although at one time, "the question of the type of remedies available under § 504 had divided the Courts of Appeals," the Supreme Court recently resolved this dispute by concluding that Title IX provides a "a full panoply of remedies, legal and equitable, to a successful plaintiff." 24 F.3d 152 (11th Cir. 1994).  Like the Fourth Circuit in Pandazides v. Virginia Board of Education,,13 F.3d 823 (4th Cir. 1994),the Eleventh Circuit concluded that "the similarities between Title IX and § 504 require the same finding . . . Thus suits under § 504 provide to plaintiffs the full spectrum of remedies." Also See  Health Care Plan, Inc. v. Aetna Life Ins. Co., 966 F.2d 738, 742 (2d Cir. 1992), Hernandez v. City of Hartford, 959 F. Supp. 125 (1977) W.B. v. Matula, 67 F.3d 484, 494; Rodgers v. Magnet Cove Public Schools, 34 F.3d 642; (8th Cir. 1994)Penney v. Town of Middleton, et al., 888 F. Supp. 332, 342 (D.N.H. 1994) Reich v. Cambridgeport Air Systems, Inc., 26 F.3d  1187 (1st Cir. 1994));Serio v. City of Milwaukee, 522 N.W.2d 36 (Wisc. Ct. Of Appeals 1994)Aikens, supra, Smith v. Barton,

914 F.2d 1330(9th Cir. 1990),and <u>Burns - Vidlak by Burns v. Chandler,</u> 980 F. Supp. 1144(D. Hawai'i, 980 F.Supp.1144 (D.Hawai'i 1997).

Thus the defendant is incorrect when it states damages are not available under the Rehabilitation Act. Defendant themselves admit this in their next argument. Although defendant initially states the Rehabilitation Act "supports only claims for injunctive relief and attorney's fees for prevailing parties" (Def. Brf. Page 8, Para 1), they contradict themselves in the very next paragraph when they admit damages are available when a defendant is deliberately indifferent.[5]

Assuming arguendo, defendant's actions must be deliberate so that plaintiffs may receive damages, the actions of the defendant in the instant case are intentional. There have been other cases in which deaf plaintiffs have been denied auxiliary aids for effective communication and have brought suit under antidiscrimination laws such as the ADA and the Rehabilitation Act, and the actions of the defendant have clearly been found to be intentional. In <u>Naiman v. New York University Medical Center,</u> supra, a deaf patient sued a hospital for failure to provide interpreting services during his visits. In discussing the very issue of intent the court stated "assuming intent is a prerequisite for monetary relief under the Rehabilitation Act, Naiman's allegation that he requested an interpreter which was not provided, coupled with the absence of any allegation that NYU attempted to provide him with effective communication sufficiently alleges intent."<u>Naiman,</u> supra.  In another case

_____

[5] Defendant erroneously states damages are available under the ADA, when in fact they are available under the Rehabilitation Act. Only Titles I, and II of the ADA not Title III permit compensatory damages as stated above in Point Two.

with identical allegations in New Jersey, four deaf plaintiffs sued Jersey City Medical Center for failure to provide auxiliary aids during treatment and the Honorable Patricia Costello of Hudson County, New Jersey  specifically found the actions of the defendant in denying interpreters were "intentional as opposed to accidental or unknowing". (A true copy of Judge Costello's opinion is attached as Exhibit I, page 4). In addition the Honorable Mark B. Epstein of the  Middlesex County Court In New Jersey  similarly found in another case involving a deaf plaintiff who brought suit against a hospital for failure to provide an interpreter and aids during the labor and delivery of her first child, that the acts of the defendant were intentional. Judge Epstein specifically found the failure to provide these aids including an interpreter to a deaf patient during medical treatment  is an affirmative intentional act. ( A true copy of the relevant pages of the Transcript of Judge Epstein's opinion is attached as Exhibit J) [6] See also <u>Proctor v. Prince George's Hospital Center</u>, 832 F.Supp. 820(D.Md. 1998)

Further discriminatory acts such as those of the defendant's in the instant case have most often been viewed at as being intentional for the discrimination, is in and of itself, is an affirmative act.

---

[6]Defendants cite one case about interpreters, <u>Freydel v. New York Hospital</u>, an unpublished decision which specifically states it is not to be used as precedent, which plaintiffs submit was wrongly decided and which has not been followed by any other court, especially in light of the United States Supreme Court Case of <u>Alexander v. Choate,</u> 469 U.S. 28(1985)

In Bartlett v. N.Y. State Board of Law Examiners,970 F. Supp.1094(S.D.N.Y.1997), the court

held that intentional discrimination had occurred under Section 504 where the defendant

erred in deciding the plaintiff was not disabled.

> The question of intent in accommodations cases does not require that
> plaintiff show that defendants harbored an animus towards her or those
> disabled such as she. Rather intentional discrimination is shown by an
> intentional or willful violation of the act itself.  With this understood, it
> becomes clear, that while the defendant may have had the best intentions,
> and while they may believe themselves to be within the confines of the law,
> they nevertheless intentionally violated the ADA and the Rehabilitation Act
> by willfully withholding from the plaintiff the reasonable accommodations
> to which she is entitled under the law.

Id at 1151

There have been many cases which similarly hold that violation of the law in and of itself

demonstrates intentional discrimination.

As the Supreme Court stated in Alexander v. Choate, 469 U.S. 28(1985)the

Rehabilitation Act covers instances of non-intentional discrimination, as "discrimination

against the handicapped was perceived by Congress to be most often the product, not of

invidious animus, but rather of thoughtlessness and indifference".The court went on to state

that "much of the conduct that Congress sought to alter in passing the Rehabilitation Act

would be difficult if not impossible to reach were the Act construed to proscribe only

conduct fueled by a discriminatory intent." Id. at 296-97.  As the court in Bartlett stated, "

at the very least, Alexander demonstrates an awareness of the Supreme Court that the

concept of intent differs markedly in accommodations caes, and hence that a different

conception of intent is appropriate for recovery of compensatory damges in non-employment accommodations cases." Bartlett, supra, at 1150.

In the instant case, plaintiffs requested interpreters again and again when they were at the hospital. Further an outside agency called the hospital and faxed over a list of interpreters to the hospital prior to the second hospitalization. The law was clear in that they were to have a policy in place which would ensure effective communication even in emergency settings and this law was in effect for almost thirty years when the plaintiffs began using this hospital. Yet this defendant failed to get interpreters for any part of any of the hospitalizations nor to provide any reasonable accommodation such as TDDs or closed captioning. This certainly demonstrates deliberate indifference to the rights and feelings of the disabled.

To deny plaintiffs monetary damages when legal rights are invaded and a federal statute provides a right to sue for such invasion, is to render the law meaningless. If the defendant is only subject to injunctive orders despite past harms which have resulted from their failure to follow a law which has been in effect for over thirty years and their outright discrimination, the defendant is encouraged to drag out litigation and truly has no need to comply with the law until and unless he is caught. Even then, if all he receives is a "slap on the wrist" the defendant has little reason to follow the law. Both jurisprudence and public policy dictate that these remedies be available to give real meaning and life to these laws, without which offending parties will act with impunity.

**POINT FOUR**

**PLAINTIFFS STATE A VALID CLAIM UNDER THE**

**FLORIDA CIVIL RIGHTS ACT**

Courts construe the Florida Civil Rights Act in conformity with the federal Americans with Disabilities Act of 1990, 42 U.S.C. § 12182, et seq. and apply federal case law when dealing with these claims. <u>McCaw Cellular Communications of Florida, Inc. v. Kwiatek</u>, 763 So.2d 1063 (Fla. 4th DCA 1999); <u>King v. Auto, Truck, Indus. Parts and Supply, Inc.</u>, 21 F.Supp.2d 1370 (N.D.Fla. 1998). Section 760.11, Florida Statutes grants a remedy for any violations of sections 760.01 to 760.10. Section 760.07, Florida Statutes, provides in pertinent part, as follows:

> Remedies for unlawful discrimination -
>
> **Any** violation of **any** Florida Statute making unlawful discrimination because of race, color, religion, gender, national origin, age, handicap, or marital status in the areas of … public accommodations gives rise to a cause of action for all relief and damages described in section § 760.11(5), unless greater damages are expressly provided for.

Emphasis added. Section 760.08 (2003), Fla. Stat., provides as follows:

> § 760.08. Discrimination in places of public accommodation
>
> All persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation, as defined in this chapter, without discrimination or segregation on the ground of race, color, national origin, sex, handicap, familial status, or religion.

Samuel D. LaForte and Nancy M. LaForte were discriminated against under Fla. Stat. 760.11(a), 760.07 and 760.08, and 760.07 incorporates 413.08. It is clear from the plain reading of the statute of the Florida Civil Rights Act that it is not limited to employment issues by the express terms of 760.07 and 760.08, and the incorporation of 509.092. In fact, employment discrimination issues are proscribed separately at § 760.10, Fla. Stat.

There is no administrative precondition to filing a claim in the court pursuant to § 760.11(5). See 760.07, Fla. Stat. The position of the FCHR is as follows:

> Section 760.07, Florida Statutes, does not enlarge the Commission's jurisdiction. That provision merely provides that if one seeks judicial relief for unlawful discrimination in any forum because of race, color, religion, gender, national origin, age, handicap and/or public accommodations, the litigant may take advantage of the relief provisions afforded under Section 760.11(5), Florida Statute (i.e. compensatory and punitive damages). That provision does not give the Commission authority to investigate and make findings of reasonable cause in areas not mentioned in Section 760.10, Florida Statutes, or Section 509.092, Florida Statutes.

See 2/11/02 letter of Derick Daniel, Executive Director of the Florida Commission on Human Relations, attached hereto as Exhibit K. An agency's interpretation of the statute that it is empowered to enforce is entitled to much deference. See <u>Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.</u>, 467 U.S. 837, 843-844 (1984); <u>Herman v. NationsBank Trust Co.</u>, 126 F.3d 1354, 1363 (11th Cir. 1997). There is **no administrative precondition** to filing a claim in the court pursuant to § 413.08. Under § 760.11(1), Fla. Stat, the statute provides in part: "Any person aggrieved by a violation of ss. 760.01-760.10 **may**

file a complaint with the commission within 365 days of the alleged violation ..." (emphasis added). There is no requirement for an administrative precondition for a violation of 760.07. In addition, any filing with the Florida Commission of Human Relations regarding a violation of a complaint against a public accommodation other than lodging, entertainment or a food service establishment under 509.092 is summarily rejected. Further, the Florida Administrative Code does not provide regulations for investigating public accommodation claims other than for eating and lodging establishments, See § 60Y-10.001 to 60Y-10.005. Even though the FCHR cannot investigate such claims, the Plaintiffs still have an action under 413.08 and 760.07. See, e.g., <u>Larsen v. Carnival Corp.</u>, Case No.: 02-20218-CIV-GRAHAM; 2002 U.S. Dist. LEXIS 10553, *16 (S.D.Fla. 2002). At the time of this incident, the FCHR **only had** jurisdiction to investigate claims involving lodging and food establishments, however, since the Civil Rights Act of 2003 was passed in October, the FCHR now has jurisdiction to investigate places of entertainment. See 760.02, Fla. Stat. (2004). The administrative procedures relevant to this are Rules 60Y-5.004 through 60Y-10.005, *Florida Administrative Code*. Pursuant to the Administrative code, the purpose is as follows:

> These rules implement the statutory provisions which make it unlawful discrimination for the operator of a public lodging establishment or a public food service establishment to refuse accommodation or service to any person when the refusal is based upon race, creed, color, sex, physical disability or national origin. The Florida Civil Rights Act of 1992 authorizes the Commission on Human Relations to investigate complaints of discrimination by public lodging establishments and public food service establishments and provides for relief by

subsequent administrative proceeding or civil action in court.

Rule 60Y-10.001, *Florida Administrative Code*. Specifically, Rule 60Y-10.002, Covered entities and facilities states that "The public lodging establishments covered by these rules are those defined in Section 509.13(4), Florida Statutes (1991). The public food service establishments covered by these rules are those defined in Section 509.13(5), Florida Statutes (1991)." In view of the recent expansion of the Florida Civil Rights act, the limited investigatory authority of the FCHR leaves a substantive right without a remedy, if this court will not accept jurisdiction and the FCHR cannot accept jurisdiction. It is a fundamental tenant of the American Legal System that "where there is a legal right, there is also a legal remedy by suit or action at law, whenever that right is invaded", further, "The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury. One of the first duties of government is to afford that protection." Marbury v. Madison, 5 U.S. 137, 163; 2 L. Ed. 60, 69; 1 Cranch 137, 163 (1803) (Marshall, J.) Plaintiffs did not need allege exhaustion of administrative remedies as there is no requirement under Florida law for an administrative precondition under § 760.07 or § 413.08, and any attempt at filing such complaint is futile, thus Plaintiffs' claim should be permitted.

## POINT FIVE

## THE DISCRIMINATORY CONDUCT OF THE DEFENDANT
## IS SUFFICIENT TO CREATE A QUESTION OF FACT
## FOR TRIER OF FACT AS TO INTENTIONAL INFLICTION
## OF EMOTIONAL DISTRESS AND OUTRAGEOUS CONDUCT.

Defendants have properly outlined the elements a plaintiff must demonstrate to recover for intentional infliction of emotional distress under Metropolitan Life Insurance Company v. McCarson 467 So. 2d 277,279(Fla. 1985). also see  Hart v. U.S. 894 F.2d 1539(11th Cir. 1990); however they have applied them improperly to the instant case. Several courts have found intentional infliction of emotional distress claims do exist in the medical setting as conduct which may be considered less offensive in other circumstances may be egregious and outrageous, if in the medical setting. In Woolfolk v. Duncan, 872 F. Supp. 1381, 6 NDLR 95(D.C.Pa 1995),the district court denied the defendant's motion for summary judgment on an intentional infliction of emotional distress claim as the court stated it could not find that the defendant's failure to provide medical benefits was not sufficiently extreme.  In Winterberg v. CNA Ins. Co. 868 F.Supp.713, 1994 WL 634187 (E.D. Pa.  Oct. 25, 1994), the court refused to dismiss an intentional infliction of emotional distress claim where examining doctor demanded that injury patient attempt to walk, and then refused to help her up, and then berated her after she fell to the floor. Also See Hoffman v. Memorial Osteopathic Hosp., 492 A.2d 1382 (Pa. Super. Ct. 1985) (concluding

-28-

that jury could find intentional infliction of emotional distress where emergency room physician ignored the pleas for help of a patient suffering from a neurological disease who had fallen to the floor and was allowed to remain there for more than one hour); see also Howe v. Hull 873 F.Supp.72, 1994 WL 682944, at *10 (N.D. Ohio May 25,1994) (refusing to conclude as a matter of law that physician's refusal to treat a seriously ill patient for any discriminatory reason is not extreme and outrageous conduct); Miller v. Spicer, 822 F.Supp. 158, 196-70 (D. Del. 1993)(same). Further this attempt to dismiss plaintiff's claim at the inception of the case, prior to the opportunity to obtain experts and discovery is premature and inappropriate.

Several states have held that the standards governing emotional distress may be different depending on the relationship between the parties. For example the standards in employer inflicted emotional distress have also been found to be more lenient. The rationale used by these courts has been that an employer is "in a peculiar position to harass an employee and thus plaintiff's status as employee should grant him greater protection from insult and outrage than if he were a mere stranger". Harris v. Jones, 281 Md. 560, 380 A.2nd 611, 615-16 (1977), Bachand v. Connecticut Gen. Life Ins. Co., 101 Wis. 2nd617, 305 N.W.2nd 149 (1981) and Alcorn v. Anbro eng'g, 2 Cal. 3d 493, 468 P.2d 216, 86 Cal. Rptr. 88 (1970).

Similarly in the instant case, the plaintiffs's status as a patient and family member placed them in an even more precarious and subservient position. Common experience often reveals that the average nondisabled hearing patient who has no inherent

communication barriers feels inadequate and disoriented when at the mercy of hospital personnel. This experience would be multiplied ten fold with an individual such as the plaintiff who could not even hear the words spoken much less begin to try to comprehend them.

As stated above, plaintiffs are deaf individuals who primarily communicates in American Sign Language. They **could not** understand anything meaningful during serious medical treatment and care without a qualified interpreter. They were **not** given "effective communication", TDDs and closed captioning as required by the ADA and the Rehabilitation Act, during repeated inpatient hospital stays. Defendant's actions in denying plaintiffs interpreters were intentional as they specifically ignored the plaintiffs' requests and those of an outside agency, time and again.

Further defendant's conduct in repeatedly denying accommodations to these individuals, an interpreter and thus effective communication, in light of Federal laws requiring same, in effect since 1973, is clearly wanton and intentional. (The Rehabilitation Act, Section 504). The fact that it happened again and again, when it was obvious the plaintiffs did not have a clue as to what was going on and kept asking for interpreters, surely transcends the bounds of human decency and morality. Their practice resulted in this horrendous treatment which is akin to veterinary medicine, treating the plaintiffs like animals without any concern for their feelings, opinions, or understanding of the treatment given to them.

Everyone has the right to be "informed" of their treatment, it's risks and benefits and of their medical condition, regardless of how serious or not serious it is. This is a basic tenant of medical care. It is inconceivable how the doctors and nurses at Wellington Regional Medical Center rendered care to the plaintiffs during serious medical treatment without any concern for their understanding and feelings. Putting aside the obvious medical malpractice issues there still remains basic human decency; how do you treat someone time and again without understanding them or giving them opportunity to understand you in even the most basic way. There can be absolutely no question but that defendant's conduct in this case was and continues to be sufficient to state a claim for intentional infliction of emotional distress, especially in light of the fact that the Rehabilitation Act requiring reasonable accommodation has been in effect since 1973 and the Americans with Disabilities Act has been in effect since 1990. Plaintiffs' allegations of defendants' obvious failure to even attempt to talk to them much of the time, much less get an interpreter to ensure effective communication, clearly rises to the level of "extreme and outrageous conduct" and as such must be submitted to the trier of fact.

Plaintiffs therefore respectfully request that Count Four not be dismissed.

## CONCLUSION

For the foregoing reasons, plaintiffs respectfully request that Defendant's Motion be denied in it's entirety.

Respectfully submitted,

Clara R. Smit, Esq.
Attorney on Behalf of the Plaintiffs
Samuel D. LaForte & Nancy M. LaForte

Dated:        June 22, 2004