## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO:  03-81087CIV-HURLEY

SAMUEL D. LAFORTE & NANCY
M. LAFORTE,

Plaintiffs,

v.

UNIVERSAL HEALTH SERVICES,  INC.
d/b/a, WELLINGTON REGIONAL MEDICAL
CENTER, HARVEY MONTIJO, M.D., individually,
AND INTEGRATED HEALTH SERVICES AT
WEST PALM BEACH, AND THE CENTER FOR
BONE & JOINT SURGERY OF THE PALM
BEACHES, P.A.



Defendants.

_____ /

## CERTIFICATE OF EXHIBITS

CLARA R. SMIT, hereby certifies as follows:

1)   I am an attorney of the State of New Jersey, Plaintiffs' attorney in the within
matter.  I am admitted Pro Hac Vice in the above mentioned matter in the
United States District Court for the Southern District of Florida.

2)   I CERTIFY that the within Exhibits in support of Plaintiffs' Opposition Brief
to Defendant Wellington Regional Medical Center, Inc.'s Motion to Dismiss
or Strike, Exhibits A through K, are true and correct copies.

3)   I CERTIFY that the foregoing statements made by me are true. I am aware
that if any of the foregoing statements made by me are willfully false, I am
subject to punishment.

Clara R. Smit, Esquire
Attorney for Plaintiffs
Samuel D. LaForte & Nancy M. LaForte

Dated:      June 22, 2004

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO: 03-81087 CIV-HURLEY
Magistrate Judge: James M. Hopkins

SAMUEL D. LAFORTE & NANCY
M. LAFORTE,

Plaintiffs,

v.                                                    SECOND AMENDED COMPLAINT

WELLINGTON REGIONAL MEDICAL
CENTER, INC., HARVEY MONTIJO, M.D.,
individually, INTEGRATED HEALTH
SERVICES AT WEST PALM BEACH,
AND CENTER FOR BONE & JOINT SURGERY
OF THE PALM BEACHES, P.A.

Defendants.

_____ /

### SECOND AMENDED COMPLAINT

COMES NOW, PLAINTIFFS, SAMUEL D. LAFORTE and NANCY M.

LAFORTE, and hereby sues WELLINGTON REGIONAL MEDICAL CENTER, INC.,

HARVEY MONTIJO, M.D., individually, INTEGRATED HEALTH SERVICES AT WEST

PALM BEACH, and the CENTER FOR BONE AND JOINT SURGERY OF THE PALM

BEACHES, P.A., and states as follows:

### NATURE OF CASE

1. On July 26, 1990, Congress enacted the Americans with Disabilities Act, 42 U.S.C.

Section 12101 et seq., establishing the most important civil rights for persons with

disabilities in our country's history. This action is brought by the Plaintiffs against the



LaForte v. Wellington Reg. al Medical Center
CASE NO: 03-81087 CIV HURLEY
Page 2 of 16

Defendants who provided care for the Plaintiff Samuel LaForte during his care in the hospitals and doctor's office, for their failure to provide reasonable accommodations for Plaintiffs' disability and for discrimination based on their disability. The Plaintiffs experienced humiliation and discrimination in violation of their civil rights through Defendants' policies and practices of discrimination on the basis of disability.

2. This action claims that Defendants violated the Florida Civil Rights Act of 1992, Fla. Stat. §760.01 et seq, the Americans with Disabilities Act, Title III, 42 USC §12181 et seq and the Rehabilitation Act, 29 USC § 794, Section 504. In this action, Plaintiffs suffered damages and now seek declaratory and injunctive relief, and compensatory and punitive damages.

## JURISDICTION AND VENUE

3. Jurisdiction of this court is invoked pursuant to Florida Civil Rights Act of 1992, Fla. Stat. §760.01 et seq, the Americans with Disabilities Act, Title III, 42 USC § 12181 et seq and the Rehabilitation Act, 29 USC §794, Section 504. This suit is authorized and instituted pursuant to the exercise of the police power of the State for the protection of public safety, health and morals and to promote the general welfare and fulfillment of the provision in the Constitution of the State of Florida and the United States of America guaranteeing civil rights.

## PARTIES

4. Plaintiffs, Samuel D. LaForte and Nancy M. LaForte, are residents of Palm Beach County, State of Florida. Plaintiffs Samuel D. LaForte and Nancy M. LaForte are profoundly deaf and communicate in American Sign Language, and are qualified individuals with disabilities under the definitions of the Rehabilitation Act and the Americans with Disabilities Act.

5. Defendant Wellington Regional Medical Center Inc. is located at 10101 Forest Hill Blvd., City of Wellington, County of Palm Beach, and State of Florida.

6. Defendant, Harvey Montijo, M.D., individually, and who is employed by Defendant, the Center for Bone and Joint Surgery of the Palm Beaches, P.A. is a for profit Florida corporation with an office located at 10131 West Forest Hill Blvd., Suite 206, West Palm Beach, County of Palm Beach and State of Florida.

7. Integrated Health Services At West Palm Beach, is located at 2939 S. Haverhill Road, West Palm Beach, County of Palm Beach, and State of Florida.

## FACTS

8. One of the most important parts of the Americans with Disabilities Act is Title III, known as the "Public Accommodations and Services Operated by Private Entities". 42 U.S.C. § 12181 et seq.

9. Florida Civil Rights Act of 1992, Fla. Stat. §760.01 et seq specifically prohibits discrimination based upon disability.

10. Section 504 of the Rehabilitation Act of 1973, provides that "No otherwise qualified individual with a disability" shall be "excluded, denied or discriminated against" by any facility receiving "federal financial assistance". 29 USC §794, §504.

11. Defendants provide public accommodations within the meaning provided in each of the above laws.

12. As relevant to the present action, discrimination includes a failure to provide appropriate and reasonable auxiliary aids to plaintiffs who have a hearing loss to ensure

effective communication. 28 C.F.R. Section 36.303(c).

    13. Among these aids include a failure to provide a sign language interpreter for the Plaintiffs, Samuel and Nancy LaForte during the care of plaintiff Samuel LaForte. These aids were requested and denied by the Defendants during the plaintiff, Samuel LaForte's medical treatment commencing on January 22, 2002 and on all occasions prior and thereafter.

    14. Plaintiff Samuel LaForte was seen by Dr. Harvey Montijo, who is employed by the Center for Bone and Joint Surgery of the Palm Beaches, P.A., prior to his surgery to his right hip and hospitalization at Wellington Regional Medical Center. Plaintiffs requested an interpreter from Dr. Harvey Montijo but none was provided. Dr. Harvey Montijo further told plaintiff that Wellington Regional Medical Center would not provide an interpreter and he would have to write back and forth or use their friend Carmel Celestino. Plaintiffs' friend, Carmel Celestino requested an interpreter be provided to the plaintiffs from Dr. Harvey Montijo and also a nurse in his employ. No interpreter was ever provided to the plaintiffs.

    15. Plaintiff Samuel LaForte thereafter went to Wellington Regional Medical Center on January 22, 2002 for surgery to his right hip. An interpreter was again requested directly from the hospital and none was provided by the defendant hospital. During this hospitalization, plaintiffs requested an interpreter and the hospital stated they only have "foreign language interpreters and not sign language interpreters". The plaintiffs were then forced to utilize and pay a hard of hearing friend, Carmel Celestino to assist in interpreting for him and his wife. Ms. Celestino was there only a short period and was ineffective but plaintiffs had no other options as the hospital failed to provide a Sign Language interpreter

and effective communication. Thus, effective communication did not take place and plaintiffs were left with no real understanding as to what took place prior to, during and after Samuel LaForte's surgery.

16. Following his discharge from the hospital, plaintiff Samuel LaForte continued physical therapy at Integrated Health Services (Coral Bay Associates) from January 24, 2002 through January 28, 2002. On all occasions, no qualified interpreter was ever provided to plaintiffs during Samuel LaForte's therapy visits and hospitalization, despite repeated requests.

17. Plaintiff Samuel LaForte was also a patient at Wellington Regional Medical Center on October 16, 2002 through October 18, 2002 for surgery to his left hip. Once again an interpreter was requested and none was provided by the defendant hospital. Two weeks prior to his hospitalization, plaintiff contacted a local agency, Deaf Services and Beth Bystrycki then contacted the hospital to advise of plaintiff Samuel LaForte's upcoming surgery and that he needed an interpreter to be arranged by the hospital. When Plaintiffs arrived at the hospital  the Nurse told them they were sorry but did not have any sign language interpreters. Thus, plaintiff Samuel LaForte was once again forced to undergo another surgery in the defendant hospital with no interpreter being provided despite repeated requests.

18. Following his discharge from the hospital, plaintiff Samuel LaForte continued physical therapy at Integrated Health Services (Coral Bay Associates) from October 18, 2002 through October 23, 2002. On all occasions, no qualified interpreter was ever provided to

plaintiffs during Samuel LaForte's therapy visits and hospitalization, despite repeated requests.

19. In addition, Plaintiff, Samuel LaForte was also seen as a patient at Wellington Regional Medical Center on October 23, 2002 through October 25, 2002 for bleeding following his surgery. There was no interpreter provided once again during this hospitalization. When plaintiff told the nursing supervisor he wanted to leave as there had been no interpreter and no effective communication, the nursing supervisor at the hospital told plaintiff Samuel LaForte he could go home. Finally as plaintiff was given no interpreter and no explanation he left the hospital. No doctor ever came to discharge Mr. LaForte. Plaintiff Samuel LaForte during all of his hospital admissions and therapy sessions repeatedly requested that an interpreter be provided. No qualified interpreter was ever provided by defendants despite repeated requests made by plaintiffs.

20. Plaintiffs were ignored, humiliated and treated like non-persons by the Defendants. The Defendants' actions resulted in plaintiffs being irretrievably denied the complete understanding of the treatment Samuel Laforte received while in the Defendants' care. In addition, Plaintiffs were not afforded the opportunity to ask questions and make medical decisions surrounding Samuel LaForte's hospitalizations and office visits at Dr. Montijo's Office. Instead they experienced shame, anxiety, emotional distress, fear and discrimination. All of Samuel LaForte's care was made more difficult and painful by their inability to communicate with the nursing staff and doctors.

21. During all of the Plaintiff Samuel LaForte's admissions to Defendants' medical

facilities, the Plaintiffs were requested to sign consent forms and other forms involving procedures and tests without an interpreter present. Plaintiffs did not fully understand what treatment was being provided to Plaintiff, Samuel LaForte or what procedures were being performed on Samuel LaForte. Plaintiffs were not told of any of the risks involved nor benefits so they could weigh any possible choices between procedures. Plaintiffs signed the forms presented to them because they feared for their health and safety and felt that there was no other option because there was no effective communication being provided to them.

22. Each and all of the above acts, both of omission and commission, were intentional acts of discrimination and each and all were a proximate cause of the damages suffered by the Plaintiffs. The Plaintiffs will require the services of the Defendants in the future as these are the closest hospitals to their home and their doctors utilize these hospitals. Based upon the Defendants' ongoing pattern of discrimination, Plaintiffs expect to be denied a reasonable accommodation for their disability in the future.

23. Defendants' willfully, knowingly and intentionally discriminated against the Plaintiffs in violation of Florida Civil Rights Act of 1992, Fla. Stat. §760.01 et seq, the Americans with Disabilities Act, Title III, 42 USC § 12181 et seq and the Rehabilitation Act, 29 USC § 794, Section 504 and caused the Plaintiffs to suffer and continue to suffer mental and physical pain and anguish.

**FIRST COUNT**
**DEFENDANTS VIOLATED TITLE III OF THE AMERICANS**
**WITH DISABILITIES ACT, 42 USC § 12181 et seq**

24.     Plaintiffs reallege and incorporate by reference the allegations of facts in

LAW OFFICES OF MATTHEW W. DIETZ, P.L. * 999 Ponce De Leon Blvd, Suite 735 * CORAL GABLES, FLORIDA 33134

paragraphs one through twenty three.

25. Plaintiffs' hearing loss substantially limits major life activities, including their ability to effectively communicate. Therefore, Plaintiffs are individuals with a disability under Title III of the Americans With Disabilities Act. Plaintiffs meet the essential eligibility requirements for Defendants' services at all times material hereto. Thus, Plaintiffs are qualified individuals with a disability and are entitled to the protections of the Americans With Disabilities Act under 42 USC § 794, et seq.

26. Defendants violated Title III of the Americans with Disabilities Act in numerous ways, including discriminatory actions which occurred when they:

(a) Failed to maintain policies and procedures to ensure compliance with Title III of the Americans With Disabilities Act, specifically policies that provide equal access and effective communication to individuals with disabilities;

(b) Failed to ensure that communications with Plaintiffs were as effective as communications with non-disabled patients;

(c) Failed to provide auxiliary aids and services, including a qualified interpreter, and to modify policies and procedures to prevent discrimination against Plaintiffs;

(d) Failed to establish effective self-evaluations and/or provide notice of Plaintiffs' rights as an individual with a disability under the Americans With Disabilities Act;

(e) Excluded Plaintiffs from services of the public entity and denied Plaintiffs the benefit of these services due to their disability.

27. Plaintiffs suffered severe emotional distress and damages in the past, and

LaForte v. Wellington Regional Medical Center
CASE NO: 03-81087 CIV HURLEY
Page 9 of 16

continue to suffer emotional distress and damages due to Defendants' violations of Title III

of the Americans With Disabilities Act.

**WHEREFORE,** Plaintiffs respectfully pray that this Court grant the following relief

against the Defendants, jointly and severally, including entering a declaratory judgment,

pursuant to Rule 57 of the Federal Rules of Civil Procedure, stating that Defendants'

practices, policies and procedures have subjected Plaintiffs to discrimination in violation of

Title III of the Americans with Disabilities Act permanently enjoining Defendants from any

practice, policy and/or procedure which will deny Plaintiffs equal access to, and benefit from

Defendants' services or which deny Plaintiffs effective communication with Defendants.

This includes entering a permanent injunction ordering Defendants:

    a. To cease discrimination against Plaintiffs and other deaf or hard of

       hearing patients;

    b. To promulgate and comply with policies and procedures to ensure that

       Defendants and its staff do not discriminate against individuals who are

       deaf and hard of hearing;

    c. To promulgate and comply with procedures to ensure that Defendants

       will provide and pay for interpreter services when needed by individuals

       who are deaf or hard of hearing in all services offered by Defendants;

    d. To promulgate and comply with procedures to ensure that Defendants

       will notify individuals who are deaf or hard of hearing of their right to

       effective communication. This notification will include posting explicit

       and clearly worded notices that state that the Defendants will provide sign

       language interpreters, TTYs and/or other communication services to

LaForte v. Wellington Regional Medical Center
CASE NO: 03-81087 CIV HURLEY
Page 10 of 16

ensure effective communication with deaf or hard of hearing persons.

e.   Award reasonable costs and attorneys' fees; and

f.   Award any and all other relief that may be necessary and appropriate.

## SECOND COUNT

## DEFENDANTS VIOLATED SECTION 504 OF THE REHABILITATION ACT

## OF 1973, 29 U.S.C. § 706

28.   Plaintiffs reallege and incorporate by reference the allegations of facts in paragraphs one through twenty three.

29.   Plaintiffs are deaf and their disability substantially limits major life activities, including their ability to effectively communicate with others who do not know sign language. Therefore, Plaintiffs are considered to be individuals with a disability under Section 504 of the Rehabilitation Act, as amended.  See 29 U.S.C. §706(8).  Plaintiffs are otherwise qualified under Section 504 of the Rehabilitation Act because they meet the essential eligibility requirements for Defendants' services at all times material hereto. Further, defendants are recipients of federal financial assistance.

30. Defendants' policies, practices and procedures, particularly the actions and omissions described above, violated the Plaintiffs' rights under Section 504 of the Rehabilitation Act by discriminating on the basis of a disability.

31. Additionally, Defendants also denied Plaintiffs services that it made available to non-disabled patients.

32. Defendants violated Plaintiffs' rights through their repeated refusal to reasonably

LaForte v. Wellington Reg. .al Medical Center
CASE NO: 03-81087 CIV HURLEY
Page 11 of 16

accommodate Plaintiffs with appropriate auxiliary aids and services or to modify

policies and procedures to prevent discrimination.

33. Plaintiffs suffered severe emotional distress and damages in the past, and continues

to suffer distress and damages due to Defendants' violations of Section 504.

**WHEREFORE,** Plaintiffs respectfully pray that this Court grant the following relief

against the Defendants, jointly and severally, including entering a declaratory judgment,

pursuant to Rule 57 of the Federal Rules of Civil Procedure, stating that Defendants'

practices, policies and procedures have subjected Plaintiffs to discrimination in violation of

Section 504 of the Rehabilitation Act permanently enjoining Defendants from any practice,

policy and/or procedure which will deny Plaintiffs equal access to, and benefit from

Defendants' services or which deny Plaintiffs effective communication with Defendants.

This includes entering a permanent injunction ordering Defendants:

        a.        To cease discrimination against Plaintiffs and other deaf or hard

                of hearing patients;

        b.        To promulgate a nd c omply w ith p olicies a nd p rocedures t o

                ensure that Defendants and its staff do not discriminate against

                individuals who are deaf and hard of hearing;

        c.        To promulgate and comply with procedures to ensure that

                Defendants will provide and pay for interpreter services when needed by

LaForte v. Wellington Regional Medical Center
CASE NO: 03-81087 CIV HURLEY
Page 12 of 16

individuals who are deaf or hard of hearing in all services offered by

Defendants;

    d.        To promulgate and comply with procedures to ensure that

Defendants will notify individuals who are deaf or hard of hearing of

their right to effective communication. This notification will include

posting explicit and clearly worded notices that state that the Defendants

will provide sign language interpreters, TTYs and/or other

communication services that ensure effective communication with deaf

or hard of hearing persons.

    e.        Award compensatory and punitive damages

    f.        Award reasonable costs and attorneys' fees; and

    g.        Award any and all other relief that may be necessary and

appropriate.

## THIRD COUNT

## DEFENDANTS VIOLATED CHAPTERS 413 AND 760 OF FLORIDA STATUTES

34. Plaintiffs reallege and incorporate by reference the allegations of facts in

paragraphs one through twenty three.

35.    Florida Statute 413.08 (1)(a) provides as follows:

> The deaf, hard of hearing, blind, visually handicapped, and
> otherwise physically disabled are entitled to full and equal
> accommodations, advantages, facilities, and privileges on

all common carriers, airplanes, motor vehicles, railroad trains, motor buses, streetcars, boats, and other public conveyances or modes of transportation and at hotels, lodging places, places of public accommodation, amusement, or resort, and other places to which the general public is invited, subject only to the conditions and limitations established by law and applicable alike to all persons. Nothing in this section shall require any person, firm, or corporation, or any agent thereof, to modify or provide any vehicle, premises, facility, or service to a higher degree of accommodation than is required for a person not so disabled. (Emphasis ours)

36.    Florida Statute 413.08(2), provides as follows:

Any person, firm, or corporation, or the agent of any person, firm, or corporation, who denies or interferes with admittance to, or enjoyment of, the public facilities enumerated in subsection (1) or otherwise interferes with the rights of a deaf person, hard of hearing person, a totally or partially blind person, or an otherwise physically disabled person under this section, or the trainer of a dog guide or service dog while engaged in the training of such dog pursuant to subsection (7), is guilty of a misdemeanor of the second degree, punishable as provided in § 775.082 or § 775.083.

37. Such discrimination encompassed in Florida Statute §413.08, is actionable civilly under Florida Statute § 760.07.

38. Courts construe the Florida Civil Rights Act in conformity with the federal Americans with Disabilities Act and apply federal case law when dealing with such claims.

39. Conditions precedent, if any, have been complied with or waived prior to bringing this action.

40. Plaintiffs have retained the services of The Law Offices of Matthew W. Dietz, P.L., and Clara Smit, Esq. and has agreed to pay them a reasonable fee for services in the

LaForte v. Wellington Regional Medical Center
CASE NO: 03-81087 CIV HURLEY
Page 14 of 16

prosecution of this cause, including costs and expenses incurred in this action. Plaintiffs are entitled to recover those attorneys' fees, costs and expenses from Defendants pursuant to Florida Statute § 760.11(5).

41. Pursuant to Florida Statute § 760.11(5), the court may issue an order prohibiting the discriminatory practice and provide affirmative relief, such as compensatory damages, damages for mental suffering, anguish, loss of dignity, and any other intangible injuries, and punitive damages.

42. Defendants violated Plaintiffs' rights through their repeated refusal to reasonably accommodate Plaintiffs with appropriate auxiliary aids and services or to modify policies and procedures to prevent discrimination.

43. Plaintiffs suffered severe emotional distress and damages in the past, and continues to suffer distress and damages due to Defendants' violations of Chapters 413 and 760 of Florida Statutes.

**WHEREFORE,** Plaintiffs respectfully pray that this Court grant the following relief against the Defendants, jointly and severally, including entering a declaratory judgment, pursuant to Rule 57 of the Federal Rules of Civil Procedure, stating that Defendants' practices, policies and procedures have subjected Plaintiffs to discrimination in violation of The Florida Civil Rights Act permanently enjoining Defendants from any practice, policy and/or procedure which will deny Plaintiffs equal access to, and benefit from Defendants' services or which deny Plaintiffs effective communication with Defendants. This includes entering a permanent injunction ordering Defendants:

        a.        To cease discrimination against Plaintiffs and other deaf or hard of hearing patients;

LaForte v. Wellington Regional Medical Center
CASE NO: 03-81087 CIV HURLEY
Page 15 of 16

b.        To promulgate and comply with policies and procedures to ensure that Defendants and its staff do not discriminate against individuals who are deaf and hard of hearing;

c.        To promulgate and comply with procedures to ensure that Defendants will provide and pay for interpreter services when needed by individuals who are deaf or hard of hearing in all services offered by Defendants;

d.        To promulgate and comply with procedures to ensure that Defendants will notify individuals who are deaf or hard of hearing of their right to effective communication. This notification will include posting explicit and clearly worded notices that state that the Defendants will provide sign language interpreters, TTYs and/or other communication services to ensure effective communication with deaf or hard of hearing persons.

e.        Award compensatory and punitive damages

f.        Award reasonable costs and attorneys' fees; and

g.        Award any and all other relief that may be necessary and appropriate.

**FOURTH COUNT**

**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

44. Plaintiffs reallege and incorporate by reference the allegations of facts in

LaForte v. Wellington Regional Medical Center
CASE NO: 03-81087 CIV HURLEY
Page 16 of 16

paragraphs one through twenty three.

45. The Defendants' employees had knowledge of Plaintiffs' disability and their needs, however and notwithstanding that knowledge, Defendants intentional deprived Plaintiffs of their rights, injured the Plaintiffs, and discriminated against the Plaintiffs.

46. As a result of the Defendants' outrageous acts, Defendants intentionally inflicted emotional distress unto the Plaintiffs.

47. As a result of Defendants' actions, Plaintiffs suffered damages.

**WHEREFORE**, the Plaintiffs demand a judgment against the Defendants for compensatory damages, extreme emotional distress, damages for physical discomfort and inconvenience, mental suffering, humiliation, loss of enjoyment of life, punitive damages, interest, attorney's fees, and such further relief as this Court deems just and equitable.

**PLAINTIFF DEMANDS A TRIAL BY JURY FOR ALL ISSUES FOR WHICH A TRIAL BY JURY IS PERMITTED.**

Dated this 10th day of February 2004.

<u>CERTIFICATE OF SERVICE</u>

We hereby certify a true and correct copy of the foregoing was mailed February 10, 2004 to: Glenn Cameron, Esq. Cameron, Davis & Gonzalez, P.A., 250 Australian Avenue South, Suite 1601, West Palm Beach, Florida 33401, and Clara Smit, Esq., Turnpike Metroplex, 190 Highway 18n, Suite 200, East Brunswick, New Jersey, 08816.

LAW OFFICES OF MATTHEW W. DIETZ, P.L.
999 Ponce De Leon Blvd, Suite 735
Coral Gables, Florida 33134
Phone (305) 669-2822
Facsimile (305) 442-4181

_____
MATTHEW W. DIETZ, ESQUIRE
FL. BAR NO. 0084905

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO: 03-81087CIV-HURLEY

SAMUEL D. LAFORTE & NANCY
M. LAFORTE,

Plaintiffs,

v.

WELLINGTON REGIONAL MEDICAL
CENTER, INC., HARVEY MONTIJO, M.D.,
individually, INTEGRATED HEALTH
SERVICES AT WEST PALM BEACH, AND
CENTER FOR BONE & JOINT SURGERY
OF THE PALM BEACHES, P.A.

Defendants.
_____/

I, Beth Bystrycki, of full age, hereby certifies and says:

1. I am a client specialist and telecommunications coordinator for the Deaf
Service Center of Palm Beach County, Inc. ("DSC"), and as such am fully familiar with the
facts contained herein.

2. The DSC is a not-for-profit organization that provides information and
services to the residents of Palm Beach County, Florida regarding hearing loss, as well as
offering products and support to individuals and their families to assist them in achieving
independence through communication access.

3. When needed, the DSC also provides hospitals and doctors with the names and
contact information of sign language interpreters for the medical providers use when dealing
with deaf patients.

4. Prior to Samuel LaForte's surgery scheduled at Wellington Regional Medical
Center ("Wellington Regional") on October 16, 2002, I was contacted by Samuel LaForte
about the LaForte's need for an interpreter while at Wellington Regional. Following my

conversation with Mr. LaForte, I contacted Wellington Regional regarding LaForte's scheduled surgery, and to advise the hospital that they needed to arrange an interpreter. I also provided the hospital employee at that time with the names and telephone numbers of interpreters to contact to arrange for a sign language interpreter for Mr. & Mrs. LaForte. I am unaware what, if anything, Wellington Regional did with the information I provided.

5.    I was later informed that the LaFortes were apparently not provided with an interpreter during Mr. LaForte's hospital stay.

6.    I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

BETH BYSTRYCKI

Dated: June 22, 2004

# Wellington Regional
## M e d i c a l   C e n t e r

10101 Forest Hill Blvd, West Palm Beach, FL 33414 - (561) 798-8500

## EMERGENCY RECORD   ☐ EC

| Patient's Last Name | First | M.I. | Sex | Age | Accompanied By: | Private Physician: | Time Entered: |
|---|---|---|---|---|---|---|---|
| Laforte | Samuel | | M | 69 | ☐ Self ☐ Spouse ☐ Parent | Sequeira | 1620 |

meds
colace
vasotec
20cor
zantac

| Triage/Med Screen Time: | Priority 1 2 3 | Mode of Arrival: | Car | Police | Taxi | | VITAL SIGNS | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Walked | | | | Time 1622 | Temp 99' | Pulse 60 | Resp 18 | SpO2 98 | B/P 135/53 | Pain Scale 0-1 Ø |

Chief Complaint: Pt c/o bleeding from rectum; mouth and hip area.

WT: 160   LMP: NA   Last Tetanus / Immunization   Visual Acuity: O.S. 20/   O.D. 20/   O.U. 20/

Med Screen Assessment: LOC: Alert ☑  Confused ___ Oriented x 3
Skin: Warm ☑  Cool ___  Dry ☑  Moist ___   Color: Normal ☑  Pale ___  Other ___
Laceration: Yes ___  No ___  Length ___   CMS Distal to Injury: WNL ___  Abnormal ___
Intervention: Ice ___  Elevation ___  Sling ___  Splint ___  N/S/Dressing ___

Triage/Med Screening Nurse: M Ezell PM

Attending Nurse: [signature]

ROS: ☐ Unable to Answer   ☑ All other Systems neg.
CONST. ☐ Weight Loss ☐ Night Sweats ☐ Fever/Chills  ☐ Nausea/Vomit ☐ Pain ☐ Indigestion
EYES ☐ Photophobia ☐ Diplopia ☐ Sore Throat  ☐ Melena ☐ Hematochezia ☐ Diarrhea
ENT ☐ Hearing ☐ Tinnitus  GI ☐ Vertigo  GU ☐ Frequency ☐ Urgency ☐ Dysuria
RESP: ☐ DOE ☐ Cough  GYN ☐ Menses ☐ Pregnancy
☐ Hemoptysis ☐ Wheezing  SKIN ☐ Pruritis ☐ Rash ☐ Other:
CV ☐ Orthopnea ☐ PND  NEURO ☐ Weakness ☐ Parasthesia
☐ Syncope ☐ Edema  PSYCH ☐ Hallucination ☐ Arthralgia ☐ Back Pain
☐ Depression

| ALLERGIES | MEDICATIONS | PAST MEDICAL HISTORY |
|---|---|---|
| NKDA | Percocet | Hip replacement |
| | Mom | Fx neck |
| | Benedryl | MI |
| | Atenolol | Deaf |

FX/CAD / CVA / HBP / DM          SMX/TOB/ ETOH

| | Diagnostic Tests | Time Ordered | Test Results |
|---|---|---|---|
| Exam Time 6² | A/B | | |
| | CBC | | |
| | Cardiac Enzymes | | |
| | PT/PTT | | |
| | BHCG | | |
| | UA | | |
| | Amylase | | |
| | AAS | | |
| | CXR | | |
| | C Spine | | |
| | EKG | | |

**Physician's Report:** ☑ SEE NURSE'S NOTES

HPI: [handwritten notes, illegible]

PE: [handwritten] Pulse Ox:

| GEN | |
| HEENT | |
| NECK | |
| CHEST | |
| HEART | |
| ABDOMEN | |
| EXTREMITY | |
| BACK | |
| NEURO | |
| DIFF. DX: | |
| X-RAY | |
| PLAN: | |

O2@ ___ via ___ Monitor:

| Time Given | Medications/Treatments |
|---|---|
| | ☐ Td 0.5 cc |
| | Demerol 25 |
| | Phenergan 25 |

AOx [handwritten]

Critical Care ___ minutes

Diagnosis: Anemia / GI Bleed

Rx:

| Time Called | Consults | Resp. Time |
|---|---|---|
| | Humas/thee | |

Condition After Tx: ☐ Improved ☑ Stable ☐ Fair ☐ Poor

PA/NP: [signature] Montgomery

Time Expired ___          ☐ DOA

Attending Physician: [signature]

| D/C Vital Signs | Time | Temp | Pulse | Resp | SpO2 | B/P | Pain Scale 0-10 | ACI |
|---|---|---|---|---|---|---|---|---|

| Notification | Time 1825 | ☐ Relative | ☐ Police Source: | Officer: | Case# | ☐ M.E. Office | | Given to | ☐ Patient ☐ Parent |
|---|---|---|---|---|---|---|---|---|---|
| Admission | | ☐ Stretcher ☐ Wheelchair | Report Called To: | Admitting Physician: Amador | | | ☐ Family ☐ N/A |
| Transfer | Time | Receiving Facility: | Receiving Physician: | | By: | | Y ☐ Person receiving ACI Demonstrated |
| Discharge | Time | ☐ Left Before Triage /Med Screen | ☐ Triage/Med Screen Not Seen | AWOL ☐ AMA Walkout | Follow up Physician: | | N ☐ Verbalized/Understanding |

000517

White - Medical Records   Canary - Emergency Department File   Pink - Physician

**WELLINGTON REGIONAL MEDICAL CENTER**
**10101 Forest Hill Blvd.**
**West Palm Beach, Florida 33414**

**HISTORY & PHYSICAL**

LAFORTE, SAMUEL                          Elias Amador, M.D.
295885

Date of Admission:

CHIEF COMPLAINT:
Bright red blood per rectum since yesterday.

HISTORY OF PRESENT ILLNESS:
The patient is a 69-year-old white male deaf who complains of bright
red blood per rectum since yesterday. The patient denies abdominal
pain, nausea, vomiting, hematemesis or melena. No fever, chills. The
patient is currently at IHS after having a left hip replaced about a
week ago. The patient was noticed anemia at IHS yesterday.
Hemoglobin was 8.5 with hematocrit 24.8. Today was 7.1 with
hematocrit 21.1. Therefore the patient was sent to the emergency
room for evaluation. At the emergency room the patient was found
with bright red blood per rectum, heme-positive with a hemoglobin
7.6 and hematocrit 23.1. Therefore the patient is admitted for
evaluation and management.

PAST MEDICAL HISTORY:
1.  Coronary artery disease status post remote
    coronary artery bypass graft.
2.  Degenerative joint disease status post recent left total hip
    arthroplasty.
3.  Hypertension.
4.  Dyslipidemia.
5.  Status post remote right total hip replacement.
6.  Deafness.

OUTPATIENT MEDICATIONS:
Percocet 5/325 mg one to two p.o. q.4h.p.r.n., Benadryl 50 mg
q.6h.p.r.n., Maalox p.r.n., Tylenol p.r.n., Atenolol 25 mg daily,
Zantac 120 mg b.i.d., hydrochlorothiazide 12.5 mg daily, Zocor 20 mg
daily.

ALLERGIES:
None.

SOCIAL HISTORY:
The patient is married. Lives with his wife. No tobacco or alcohol
use.

FAMILY HISTORY:
Noncontributory.

REVIEW OF SYSTEMS:
CARDIOVASCULAR: Positive for remote coronary artery bypass graft. No
problems since then.

**WELLINGTON REGIONAL MEDICAL CENTER**
**10101 Forest Hill Blvd.**
**West Palm Beach, Florida 33414**

**HISTORY & PHYSICAL**

LAFORTE, SAMUEL                          Elias Amador, M.D.
295885
Admit:


RESPIRATORY: Negative.
GASTROINTESTINAL: Positive. See HPI.
GENITOURINARY: Negative.
MUSCULOSKELETAL: Negative.
NEUROLOGIC: Negative.
EYES: Negative.

PHYSICAL EXAM:
VITAL SIGNS: Blood pressure 135/53, pulse 60, respirations 18,
Temperature 99.1.
GENERAL: The patient is active, alert, oriented x 3 in no apparent
distress.
HEENT: Head: Normocephalic, atraumatic. Pupils equal, round and
reactive to light and accommodation. Extraocular movements intact.
Anicteric sclerae, moist oral mucosa without lesions.
NECK: Supple. No JVD, no thyromegaly. Normal carotid upstroke
without bruits, no cervical adenopathy.
LUNGS: Clear to auscultation bilaterally with good air movement.
HEART: Regular rate and rhythm. Normal S1, S2.
ABDOMEN: Bowel sounds positive, soft, depressible, nontender,
nondistended, no organomegaly palpated.
EXTREMITIES: No cyanosis, clubbing or edema. 2+ pulses throughout.
NEUROLOGIC: Grossly intact.

LABORATORY DATA:
Hemoglobin 7.6, hematocrit 23.1, EKG shows normal sinus rhythm
without any acute changes. Positive for right bundle branch block.
WBC from IHS: WC 7.4, hemoglobin 7.1, hematocrit 21.1. Platelets
281,000.

IMPRESSION:
1.  Lower gastrointestinal bleed with anemia.
2.  Degenerative joint disease status post recent left total hip
    arthroplasty.
3.  Coronary artery disease status post remote coronary artery
    bypass graft.
4.  Hypertension.
5.  Dyslipidemia.
6.  Deafness.

PLAN:
Will admit to medical floor. Will consult GI for possible endoscopy.
Will type and cross two units and transfuse. Will monitor H&H
closely. Will initiate Pepcid 20 mg I.V. b.i.d., will continue
Atenolol. Will hold hydrochlorothiazide for now.  Will hydrate with

2c9

**WELLINGTON REGIONAL MEDICAL CENTER**
**10101 Forest Hill Blvd.**
**West Palm Beach, Florida 33414**

**CONSULTATION REPORT**

LAFORTE, SAMUEL
295885

DATE OF CONSULTATION:  10/23/2002
CONSULTING PHYSICIAN:  Frederick S. Sherman, M.D.
ATTENDING PHYSICIAN:  Elias Amador, M.D.

REASON FOR CONSULTATION:
GI bleed.

IMPRESSION:
1.  GI bleed.   Rule out diverticula or other.
2.  Degenerative joint disease status post recent left total hip
    replacement.
3.  Coronary disease.
4.  Hypertension.
5.  Dyslipidemia.
6.  Deafness.

RECOMMENDATIONS:
1.  Agree to current treatment plan.
2.  Will obtain baseline laboratory values.
3.  Transfuse.
4.  Proceed with endoscopy in the morning.

HISTORY:
69-year-old male who is deaf and mute.  Brought to the hospital for
bright red blood per rectum and hemoglobin of 7.6.  The day before
that, it had been in the 8s.  There is no mention of basic metabolic
panel but there is definite mention that there is no history of
melena. The patient denies any abdominal pain.  The history is
somewhat limited due to the fact that he is deaf and mute.  There is
no history of ulcer disease.  He does have a history of coronary
disease status post coronary artery bypass graft in the past.

MEDICATIONS:
At this facility included: Colace.  Arixtra.  Vasotec.  Atenolol.
Hydrochlorothiazide.  Zocor.  Zantac b.i.d.  p.r.n. Percocet was
written.

PHYSICAL EXAMINATION:
GENERAL:   White male.  Comfortable in no acute distress.
VITAL SIGNS:  Afebrile.  Vital signs stable.
HEENT:  Sclerae anicteric.  Mucus membranes are pale and moist.
NECK:  Supple.  Full range of motion.
LUNGS:  Clear to auscultation.
HEART:  Regular rate and rhythm.
ABDOMEN:  Soft.  Nontender.  Nondistended with normal active bowel

Does this T.V. have built in Closed captioned.?

T.V. would show CC on the board !!

Hospital must provide Closed caption T.V. to deaf clients without their asking for it. acrording to A.D.A. LAW !

ABC

Remote Mute

I AGREE

I have to get another remote to turn on close captioning

Be Back

Do your best

Mean donate to Death

Donate organ after death

very Most interpreta

Fart

---

You are going to get Wash this morning

---

Why not go to X Ray

Last night start more pain

DO you want something For pain

Last night not go to execuse

mostly

[illegible]

[illegible]

[illegible]

Dr Amador says he can go home now

IHS

The lady from IHS (Donna) says you were ready to leave the rehab for home when you were readmitted for this GI problem. Did you feel you need more physical therapy there?

Social worker told me that he'll go home this Mon.

How long he stay here!

Dr. Amador?

I'm waiting for doctor!
He may call orders in +
see him in AM. I don't
know yet. ok. Can you fax
me!

I want to know what happen with his low blood!

We received 2 units of blood early this morning—

He went for his EGD/Colonoscopy they found Hiatal Hernia and DIVERTICULOSIS

No bleeDing was seen that I know of —

They are going to draw his blood again to check his hemaglobin and hematoc levels. To see if they came ↑ after transfusion

He want to drink gingerale.

I need to check the Dr. order - I just received a call - they want him to have a scan - he cannot have any food or Drink now because of this test.

_____

No food / Drink -
He will be picked Up at 1:00 today for a "Mechel Scan" - It scans the Abdomen - he will be downstairs for about one hour. They will inject a dye into his I.V. line.

Do you feel his condition
will differ greatly in 2 days.

Go home

I have the authorization
for a home health nurse
to see him at home
tomorrow. However, if you
feel strongly that he
requires a couple more
days, I'll call Health
Options back.
Please fax no phone



**Wellington Regional**
**M e d i c a l   C e n t e r**

10101 Forest Hill Blvd, West Palm Beach, FL 33414
**(561) 798-8500**

**INFORMED CONSENT FOR SURGICAL OPERATIONS**

I request Dr. HARVEY MONTIJO _____ and such associates and assistants as (s) he may deem necessa

direct to perform upon  Samuel La Forte _____ the following proce

(Patient's Name)

Right Total Hip Arthro Plasty (right out)

If during the course of these procedures the discovery of unforeseen conditions require in the judgement of the pe
described above, different procedures than those planned I authorize such different procedures as are deemed approp

I authorize the transfusion or administration of blood or blood products and drugs during surgery and hospitalization as m
deemed necessary by my or the patient's attending physicians. I understand that no warranties or guarantees are mac
connection with blood, blood components, or drugs provided in the Hospital.

I understand that no warranty or promise has been made to me regarding outcome of the proposed procedure or cure of
condition. The nature of the risks and hazards presented by the proposed procedure or treatment, that a reasonable pa
would consider material to making an informed decision, has been fully explained to me and I have a general and suffic
understanding.

I understand that the physicians are not employees of the hospital. My physician has explained to me any medically accept
alternatives to the proposed procedure or treatment. I have been given an opportunity to ask questions about my or
patient's condition, alternative forms of treatment, risks of non-treatment, risks of treatment, the procedure to be used and
hazards, complications and consequences which are or may be associated with the procedure described here in. I believe
I have sufficient information to give this informed consent. I have read, or have had read to me this form, and I understan
contents.

Disposal of Tissues, etc: I hereby authorize the attending physician(s) and Wellington Regional Medical Center to preserve
scientific or teaching purposes, to use in the treatment of other living persons, or to dispose of any severed tissues, body pa
or organs removed as necessary part of my care, except as noted here:

_____

_____     self         1-17-02
(Signature of Patient / Authorized Person)    Relationship          Date

_____     1-17-02
(Signature Witnessed By)               Date

                                       1-17-02
_____     Date
Physician Signature

_____     _____
Physician Signature                    Date

**WHEN CONSENT IS GIVEN VIA TELEPHONE:   (Two witnesses needed)**

_____     _____
Name of Consenting Party               Relationship

_____     _____
Signature of Witness                   Date

_____     _____
Signature of Witness                   Date

*Deaf — needs interpreter —*

000112

EMORANDUM

DEPARTMENT OF HEALTH, EDUCATION, AND WELFARE
OFFICE OF THE SECRETARY

:   Regional Directors
    Regions I thru X

DATE:  April 21, 1980

{  :  Rosa J. Stewart, Director
      Office for Civil Rights

:CT:  OCR's Position on the Provision of Auxiliary Aids for Hearing Impaired
      Patients in Inpatient, Outpatient and Emergency Treatment Settings

As a result of increasing numbers of compliance reviews of health
service providers and of individual complaints against hospitals by
people who are hearing impaired, we have received requests from
regional staff to clarify the requirements of section 84.52 of this
Department's Section 504 regulation.  The attached policy interpre-
tation addresses these requirements as they relate to persons who
are hearing impaired.

Section 84.52 generally outlines the obligations of health care
providers to deliver their services in a fashion which renders them
effective to handicapped people who seek them.  Where necessary to
provide effective services, the regulation requires recipients to
provide auxiliary aids such as sign language interpreters to those
hearing impaired persons who need them.  Since it is the auxiliary
aids requirement that has prompted most of the inquiries from regional
staff, we have undertaken especially to clarify its meaning.  In so
doing, we have specified the obligation of recipients to have a range
of communication options available for use by hearing impaired persons
who might require them.

We believe the policy interpretation represents a lawful, feasible
and enforceable standard by which the activities of recipient health
care providers should be measured.  We expect to monitor the imple-
mentation of this policy, particularly the frequency of selection of
particular auxiliary aids from among the options available, and the
health service context in which those aids appeared to be required
most frequently.  Moreover, during this monitoring period, we shall
consult with health care recipients and their organizations, as well as
organizations of hearing impaired people.  The information gathered in
those efforts will be evaluated to determine whether any modifications
of this policy are necessary.

Page 2

Pending complaints and compliance reviews, as of the date of this memorandum, must hold recipients to the standards enumerated in the attached policy statement.  However, in those pending cases in which OCR has found violations, regions must give recipients up to 60 days to meet the requirements of this policy statement before requiring additional remedial action.

We expect to publish a training manual entitled "Communicating with Hearing Impaired Patients" within the next several months.  This manual will be sent to a wide range of health care providers and should greatly facilitate our compliance efforts.

If you have any questions regarding this policy interpretation, please contact Edward A. Stutman, Chief, Handicap Discrimination Branch, (202) 472-5300.

Attachment

OCR's Position on the provision of Auxiliary Aids for Hearing Impaired
Patients in Inpatient, Outpatient and Emergency Treatment Settings.

Section 84.52 of the Department's Section 504 regulation requires
that recipient health care providers be prepared to draw upon a
full range of communication options (auxiliary aids) in order to
insure that hearing impaired persons are provided effective access
to health care services.* Such communication options are required
to have been developed in consultation with "handicapped persons
or organizations representing handicapped persons" in the health
care provider's Self Evaluation which is required by Section 84.6
of this Department's Section 504 regulation. This range of options
must include formal arrangements with interpreters who can accurately
and fluently express and receive in sign language, supplemental
hearing devices, written communication, flash cards and staff training
in basic sign language expressions relevant to emergency treatment.
The names, addresses, phone numbers and hours of availability of
interpreters must be readily available to the recipient's employees.
Thereafter health care providers have an obligation to insure that
timely notice is given to hearing impaired persons seeking treatment
of the range of communication options that the recipient offers.
Family members may be used only if they are specifically requested
by the hearing impaired person.  In addition, health care providers
must have at least one teletypewriter (TTY) or an arrangement to
share a TTY line with other health care facilities.

---

*45 CFR 84.52 (d)(3) states that these auxiliary aids "may" include
some of these measures and devices.  We interpret this provision
as illustrative rather than providing discretion to recipients.
We have found that, as a practical matter, recipients cannot meet
their effective communication obligation with out providing a wide
range of communication options.

Page 2

In most circumstances, we believe that the hearing impaired person is in the best position to determine what means of communication is necessary to insure an equal opportunity to benefit from health care services. Therefore, the patient's judgment regarding what means of communication is necessary to insure effective communication must be accorded great weight.  In the event of disagreements between the health care provider and the hearing impaired patient, there will be a presumption favoring the hearing impaired patient's self-assessed need.  Thus, we expect that the health care provider will usually defer to the hearing impaired patient's judgment.  This would certainly be appropriate whenever it is unclear whether a hearing impaired patient understands what is being communicated or health care staff are not certain what the patient is trying to communicate.  The rest that incomplete or inaccurate communication will adversely affect a patient is significantly greater when the health care provider has little or no medical information on the patient or the patient's specific health care needs.

However, in emergency treatment settings, it may not always be feasible to immediately provide the hearing impaired person with the full range of communication options otherwise available.  The analysis to the Department's Section 504 regulation (42 FR 22694) specifically notes that the desired result, in the context of emergency treatment, is to assure that "some means of communication is immediately available for deaf persons. . ." (emphasis added).  We interpret this discussion to mean that in any period before the full range of options becomes available, including sign language interpreters, recipients must provide the most effective form of communication possible in light of the time constraints of the emergency treatment setting.

Disagreements between health care recipients and hearing impaired persons as to whether a particular mode of communication constitutes effective communication will be resolved by OCR during the investigation of any complaint alleging that the recipient did not meet its obligation to provide effective communication.  The presumption favoring the hearing impaired patient's self assessed need is not overcome merely by a showing that the hearing impaired patient suffered no harm.  Rather, the recipient must demonstrate that the hearing impaired patient actually understood what was being communicated through the alternative communication option.  If the Office for Cifil Rights finds that Health care recipients are not meeting the requirements of Section 84.52 as they relate to hearing impaired persons, the Director may take such remedial action as is deemed necessary to overcome the effects of such discrimination pursuant to the authority of Section 84.6 of this Department's Section 504 regulation.  For example, if OCR finds that a recipient has

**Page 3**

not provided a full range of communication options or has unreasonably denied a hearing impaired patient's request for a particular mode of communication OCR may, through remedial action, require the recipient to provide a particular hearing impaired patient or all its hearing impaired patients with that form of communication that each patient believes will insure effective communication.

Where a recipient claims that it is unable to comply with the 84.52(d) mandate to provide "appropriate aids" because of geographic remoteness, OCR will require a compliance plan.  The plan must document efforts which the provider will make to insure that a full range of communications options is available, and that hearing impaired patients are provided with effective communication.  Providers also may obtain assistance from re-ferral sources such as the national or state registry of interpreters, state commissions for the deaf, and state schools for the deaf in order to meet the requirements of section 84.52(d)

# 6 NDLR ¶ 129

Elaine **AIKINS**, California Association of the Deaf
<div style="text-align:center">Plaintiffs</div>

<div style="text-align:center">v.</div>

**ST. HELENA HOSPITAL**, James Lies, M.D.
<div style="text-align:center">Defendants</div>

No. C 93-3933

U.S. District Court, Northern District of California

April 4, 1994

- Practice and Procedure, Standing
- Americans with Disabilities Act (ADA), Public Accommodations, Auxiliary Aids and Services

## Summary

A woman with deafness and an association for the deaf alleged that a hospital violated the ADA, the Rehabilitation Act, and a state law against discrimination by failing to provide interpreter services for patients and their families. In an amended complaint, the name of a former patient was added to the lawsuit. The hospital moved for dismissal.

*HELD:* for the hospital, in part.

The court concluded that the patient should be dismissed from the action, since it was improper to add his name to the complaint. The court granted the woman and the association permission to amend their complaint to add statements regarding their standing to seek injunctive relief. It did not give them permission to add a name to the complaint. The woman and the association alleged sufficient facts to establish their standing to seek injunctive relief. However, they may not be able to demonstrate the likelihood of harm that would be required to withstand a motion for summary judgment. The hospital's motion to dismiss was granted with respect to the patient, and denied as to the woman and the association.

**SMITH, J.**

## Order Granting in Part and Denying in Part Defendants' Motions to Dismiss

### Issues

The pending motions to dismiss raise the questions whether plaintiffs Elaine Aikins ("Mrs. Aikins") and California Association of the Deaf ("CAD") have standing to seek injunctive relief under various federal and state anti-discrimination statutes and whether Anthony Caloroso, Jr., was properly joined as a plaintiff. For the reasons discussed herein, the Court holds that plaintiffs do have standing but that the amended complaint was improper insofar as it attempted to join Mr. Caloroso as a plaintiff.

© 2000 LRP Publications   all rights reserved   Page 5

## Introduction

In the underlying action, plaintiffs Elaine Aikins and California Association of the Deaf brought suit against defendants St. Helena Hospital ("St. Helena," "the hospital") and Dr. James Lies ("Dr. Lies") for violations of the Americans with Disabilities Act ("the ADA"), the Rehabilitation Act of 1973, and various California civil rights statutes. On February 2, 1994, this Court issued an order which, among other things, dismissed plaintiffs' claims for injunctive relief with leave to amend to allege standing. Plaintiffs subsequently filed an amended complaint, which, in addition to supplementing the allegations with respect to standing, added Anthony Caloroso, Jr., as a plaintiff.

Both defendants have again filed motions to dismiss. Defendants allege that plaintiffs lack standing to seek injunctive relief; they also contend that Mr. Caloroso's joinder was improper and, accordingly, seek his dismissal from the action.

## Background

The Court will not repeat here the factual background of this action, which was fully set forth in the Court's February 2, 1994, order. The amended complaint essentially reiterates that background, supplementing the allegations with respect to standing as discussed herein.

The Court notes, however, that Mrs. Aikins and CAD have attempted in their amended complaint to join a third plaintiff, Anthony Caloroso, Jr. ("Mr. Caloroso"). Mr. Caloroso is a forty-nine year old resident of Napa County, California, whose primary language, like Mrs. Aikins's, is American Sign Language ("ASL"). Mr. Calaroso suffers from liver-related health complications. St. Helena Hospital is the nearest medical facility that can treat Mr. Caloroso's liver problems. In 1993, Mr. Caloroso was admitted twice to St. Helena. He alleges that the hospital failed on both occasions to communicate with his wife, who is also deaf, and him effectively. Due to the unavailability of interpreter services at St. Helena, the Calorosos were forced to rely upon their eight-year-old daughter to interpret communications between the medical staff and themselves. Mr. Caloroso expects to use the hospital again in the future, as he is currently awaiting a liver transplant.

## Discussion

### I. The Joinder of Mr. Caloroso

Defendants challenge Mr. Caloroso's joinder on two grounds: (1) that it was effected in violation of Rule 15 and (2) that it was improper under Rule 20. Rule 15(a) provides, in pertinent part: "A party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served.. . .Otherwise a party may amend the party's pleading only by leave of court or by written consent of the adverse party.. .." Fed. R. Civ. P. 15(a) (West 1992). Defendants contend that Mr. Caloroso's joinder as a plaintiff was improper, as defendants had already served responsive pleadings, and plaintiffs failed to seek leave to join Mr. Caloroso.

By the Court's order of February 2, 1994, plaintiffs were given leave to amend their complaint to supplement their allegations with respect to their standing to seek injunctive relief. Plaintiffs did not request leave to name a new plaintiff, and the Court's order cannot reasonably be construed as having granted plaintiffs such leave. The joinder of Mr. Caloroso directly contravened Rule 15(a). *See O'Rear v. American Family Life Assurance Co.,* 784 F. Supp. 1561 (M.D. Fla. 1992). Mr. Caloroso is, accordingly, DISMISSED from the action.[1]

## II. Plaintiffs' Standing to Book Injunctive Relief

### A. The Legal Standards

### 1. The Requirements of Standing

The Supreme Court has developed a three-part test for standing, a constitutional prerequisite growing

©2000 LRP Publications, all rights reserved - Page 6

out of Article III's "case or controversy" requirement. *See* U.S. Const. art. I, § 2, cl. 1. The first prong of the test is the "injury in fact" requirement: "[T]he plaintiff must have suffered an 'injury in fact'--an invasion of a legally-protected interest which is (a) concrete and particularized; and (b) 'actual or imminent,' not 'conjectural' or 'hypothetical.'" *Lujan v. Defenders of Wildlife,* __ U.S. __, 112 S.Ct. 2130, 2136 (1992). The second and third elements of the test are causation and redressability. *Id.* As it is clear that defendants caused whatever violation of the relevant statutes may have occurred, and that a favorable decision of this Court would redress any injuries caused by violation of the statutes, only the first aspect of the inquiry is at issue here.[2]

*City of Los Angeles v. Lyons,* 461 U.S. 95, 105 (1983), established that a plaintiff seeking injunctive relief premised upon an alleged past wrong must demonstrate a "real and immediate threat" of repeated future harm to satisfy the injury in fact prong of the standing test. This requirement is independent of the substantive requirements for equitable relief. *Id.* at 111. In *Lyons,* the plaintiff was a black resident of Los Angeles who alleged that he had been subjected to a "chokehold" without provocation or justification during a routine traffic stop. Plaintiff brought suit against the officers involved in the incident and the city of Los Angeles, seeking both damages and injunctive relief. The Supreme Court held that plaintiff had no standing to pursue a claim for injunctive relief because he could not show that he was "realistically threatened by a repetition of his experience.. .." *Id.* at 109. To make this showing, plaintiff "would have had not only to allege that he would have another encounter with the police but also to make the incredible assertion either (1) that *all* police officers in Los Angeles *always* choke any citizen with whom they happen to have an encounter, whether for the purpose of arrest, issuing a citation, or for questioning, or (2) that the City ordered or authorized police officers to act in such a manner." *Id.* at 105-06.

In view of the standards set forth above, plaintiffs must allege that they are subject to a "real and immediate threat" of future harm at the hands of defendants to have standing to seek injunctive relief. This requirement has two components: that plaintiffs are likely to be served by defendants in the future and that defendants are apt to discriminate against them at that time. In its order of February 2, 1994, the Court dismissed plaintiffs' claims for injunctive relief with leave to amend to make these allegations.

## 2. The Standard on Rule 12(b)(6) Motions

A motion to dismiss pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted tests only the sufficiency of the complaint.[3] *North Star Int'l v. Arizona Corp. Comm'n,* 720 F.2d 578, 581 (9th Cir. 1983). Dismissal of an action under Rule 12(b)(6) is appropriate only where it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim, which would entitle him to relief." *Levine v. Diamanthuset, Inc.,* 950 F.2d 1478, 1482 (9th Cir. 1991) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 101-02 (1957)). In reviewing a motion to dismiss, the Court must assume all factual allegations to be true and must construe them in the light most favorable to the nonmoving party. *North Star,* 720 F.2d at 580.

The elements of standing are "not mere pleading requirements but rather an indispensable part of the plaintiff's case.. .." *Defenders of Wildlife,* __ U.S. at __, 112 S. Ct. at 2136. Accordingly, the Court evaluates the elements of standing in the same manner as the other elements of plaintiff's case: They must be established "with the manner and degree of evidence required at the successive stages of the litigation." *Id.* Defendants' motions to dismiss should be granted only if it appears with certainty that plaintiffs can present no set of facts consistent with the allegations of their complaint to show that they are subject to a real and immediate threat of future harm at the hands of defendants.

## B. Mrs. Aikins's Standing

The complaint contains the following allegations relevant to Mrs. Aikins's standing to seek injunctive relief: that plaintiff visits her mobile home near the hospital several times a year and considers it reasonably possible that she might need to seek services from the hospital (complaint ¶ 4), and that defendants are engaged in a "pattern and practice of violating" pertinent anti-discrimination statutes

©2000 LRP Publications all rights reserved    Page 7

designed to ensure access to services by deaf people and other individuals with disabilities (Complaint ¶ 28). While the facts contained in these allegations are undoubtedly insufficient to withstand a motion for summary judgment, they are sufficient for mere pleading purposes. It does not appear with certainty that Mrs. Aikins will be unable to prove any set of facts to establish her standing to seek injunctive relief in accordance with the standards set forth above. Defendants' motions to dismiss Mrs. Aikins's claims for injunctive relief are DENIED.

## C. CAD's Standing

An association seeking to bring suit on behalf of its members must show: (1) that its members would have standing to sue in their own right; (2) that the interests that it seeks to protect are germane to the organization's purpose; and (3) that neither the claims asserted nor the relief requested require the participation of individual members. *Greater Los Angeles Council on Deafness v. Baldrige*, 827 F.2d 1353, 1358 (9th Cir. 1987). In its previous order, the Court found that plaintiffs had satisfied the second and third requirements of this test but had failed to demonstrate, in a manner sufficient to withstand defendants' motions for summary judgment, that its members would have standing to sue in their own right. Due to the infancy of the action, the Court dismissed CAD's claims for injunctive relief with leave to amend.

The amended complaint contains several additional allegations in support of CAD's standing to pursue injunctive relief. Most notable for purposes of the present motions is the allegation that CAD has members, including Mrs. Aikins and Mr. Caloroso, who will likely be served by and subjected to discrimination at the hands of defendants in the future (Complaint ¶ 6), and that defendants are engaged in a "pattern and practice" of denying deaf individuals' rights under specified anti-discrimination statutes (Complaint ¶ 28). These allegations are sufficient to establish CAD's standing to seek injunctive relief at this stage, although they may not demonstrate the likelihood of harm that would be required to withstand a motion for summary judgment.

Dr. Lies argues that, in order for CAD to have standing to pursue claims for injunctive relief on behalf of its members, all of its members must have standing to sue in their own right. This assertion is patently wrong. The Supreme court made clear in *Warth v. Seldin*, 422 U.S. 490, 511 (1975) (emphasis added), that "an association may have standing solely as the representative of its members. . .[if it alleges] that its members, *or any one of them*, are suffering immediate or threatened injury as a result of the challenged action. . .so long as the nature of the claim and of the relief sought does not make the individual participation of each injured party indispensable to proper resolution of the cause.. . ." Dr. Lies's proposed rule would both violate established law and undermine the policy of allowing associations to represent the interests of their constituents. The Court DENIES defendants' motions to dismiss CAD from the action.

## Conclusion

For the foregoing reasons, the Court GRANTS defendants' motions to dismiss Mr. Caloroso as a plaintiff and DENIES their motions to dismiss Mrs. Aikins's and CAD's claims for injunctive relief. The April 15, 1994, hearing date is hereby VACATED.

Plaintiffs have filed a motion for leave to file a second amended complaint, noticed for a hearing on May 6, 1994. Defendants shall file a joint opposition to that motion by April 14, 1994, not to exceed ten pages in length. Plaintiffs shall file a reply of no more than ten pages by April 21, 1994.[4] in their opposition and reply memoranda, the parties shall not incorporate previous filings by reference but shall include in the briefs all facts and arguments that they wish the Court to consider.

No party shall file a further motion for summary judgment prior to the close of nonexpert discovery, presently scheduled for September 15, 1994.

SO ORDERED.

[1] The Court's determination of the Rule 15 issue makes it unnecessary to consider the propriety of Mr. Caloroso's joinder under Rule 20. The Court will consider this issue when it determines plaintiffs' newly

© 2000 LRP Publications, all rights reserved - Page 8

filed motion for leave to amend, presently scheduled for a hearing on May 6, 1994.

[2] St. Helena appears to argue that plaintiffs have also failed to satisfy the redressability requirement of the standing inquiry. (St. Helena Reply at 6-7.) This argument is frivolous. The Court has wide discretion to shape injunctive relief.

[3] Rule 12 provides that a motion to dismiss for failure to state a claim "shall" be treated as a motion for summary judgment when matters outside the pleadings are presented and not excluded by the Court. Fed. R. Civ. P. 12(b) (West 1992). The decision whether to convert a motion to dismiss into a motion for summary judgment is within the Court's discretion *Marilyn Miglin, Inc. v. Gottex Industries, Inc.,* 790 F. Supp. 1245 (S.D.N.Y. 1992). Because it seems clear that plaintiffs are not prepared at this point to oppose a motion for summary judgment on the grounds of standing, the Court exercises its discretion to exclude the declarations filed with plaintiffs' opposition and treat defendants' motions as motions to dismiss. The Court cautions the plaintiffs to exercise greater care in future filings, however.

[4] In addition to noting plaintiffs' error with respect to the filing of declarations, the Court observes that St. Helena's reply brief filed in connection with its motion to dismiss again failed to comply with the requirements of Local Rule 220-4, to which the Court specifically directed the parties' attention in its order of February 2, 1994. The parties are reminded that the Court expects compliance with the requirements of both the Local and the Federal Rules, as well as the standing orders of the Court. In addition, the Court notes that all briefs should be double-spaced and should employ a font that results in the inclusion of not more than ten characters per inch.

# SUPERIOR COURT OF NEW JERSEY



PATRICIA K. COSTELLO, J.S.C.

HUDSON COUNTY COURTHOUSE
583 NEWARK AVENUE
JERSEY CITY, NJ 07306

May 18, 1998

Clara R. Smit, Esq.
Turnpike Metroplex
Suite 200
190 Highway 18
East Brunswick, NJ 08816

Carmel J. Decker, Esq.
Eisenhower Plaza II
Suite 2575
354 Eisenhower Parkway
Livingston , NJ  07093-1023

RE: Williams, et als. v. Jersey City Medical Center
Docket No. HUD-L-5059-95

Dear Counsel:

This matter comes before the court by way of a partial summary judgment motion brought by defendant Jersey City Medical Center ("defendant") against plaintiffs Anthony Williams, Jacqueline Shreiber, Vanessa Pettiford, Tamica Williams and Ida Hickson ("plaintiffs").  Defendant seeks summary judgment dismissing plaintiffs' claims for intentional infliction of emotional distress in the Second Count of the Complaint and for outrageous conduct in the Third Count of the Complaint or in the alternative dismissing plaintiffs' claims under the Americans with Disabilities Act, 42 U.S.C.A. § 12132 ("ADA")  and Section 504 of the Rehabilitation Act of 1973 ("Rehabilitation Act") for failure to file within the two-year statute of limitations. (Defendant's motion to dismiss plaintiffs' claims under the NJLAD is moot as a result of a prior court decision).

The facts giving rise to the controversy are not in dispute.  Plaintiffs are deaf and communicate primarily through American Sign Language.  Over an extended period of time, each of the plaintiffs has received medical treatment at Jersey City Medical Center ("JCMC").  Plaintiffs allege that during the time that they were under care and treatment at JCMC, they repeatedly requested and were denied appropriate auxiliary

aids. including sign language interpreters, to accommodate their hearing impairment. They claim that as a result, they did not have complete or adequate understanding of the medical care they were receiving, or an ability to effectively communicate with the staff of JCMC.

The first issue before the court is whether the failure of JCMC to provide interpreters and other auxiliary devices to plaintiffs during their respective hospital visits constituted outrageous conduct causing intentional infliction of emotional distress.

The New Jersey Supreme Court has recognized a cause of action for the intentional infliction of emotional distress. King v. Port Authority of New York and New Jersey, 909 F.Supp. 938 (1995); Buckley v. Trenton Savings Fund Society, 111 N.J. 355 (1988); Hume v. Bayer, 178 N.J. Super. 310 (1981). Under New Jersey law, in order to succeed under such a claim, a plaintiff must prove: (1) the defendant acted intentionally or recklessly (intending to do the act and to produce the emotional distress); (2) defendant's conduct was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and be regarded as atrocious and utterly intolerable in a civilized community; (3) defendant's actions were the proximate cause of plaintiff's emotional distress, and (4) the emotional distress suffered by plaintiff was so severe that no reasonable person could be expected to endure it. See also Restatement (2d) of Torts, s 46.

JCMC argues that pursuant to the definition of intentional infliction of emotional distress set forth in Restatement (2d) of Torts, § 46 as adopted by New Jersey courts, plaintiffs' claims must fail as there is insufficient evidence to support the contention that an act or omission on behalf of JCMC produced the severe emotional distress which rises to the level required.  JCMC also asserts that while interpreters were provided at certain times by JCMC the lack of interpreters on other occasions does not amount to conduct exceeding "all possible bounds of decency."

As to the issue regarding intentional infliction of emotional distress, plaintiffs have failed to demonstrate each of the elements necessary to sustain such a cause of action. It cannot be held that JCMC acted intentionally or recklessly in that it intended both to do the act and to produce the resultant emotional distress.  While public policy arguments may support the assertion that defendant's conduct was unfair or offensive in nature, it cannot be held that the failure to provide interpreters or auxiliary aids was so outrageous in character and extreme in degree as to go beyond all possible bounds of decency.

As stated in Cautilli v. G.A.F. Corp., 531 F.Supp. 71, 74 (E.D. Pa. 1982) (applying New Jersey law), the "application of this tort must be restricted to instances of extreme and

outrageous conduct; indeed, the limited scope of the tort tolerates many kinds of unjust, unfair and unkind conduct." Examples of extreme and outrageous conduct can be found in Hume v. Bayer, supra, 178 N.J. Super. at 315 (Law Div. 1981), citing Prosser, Law of Torts, §12 (4th Ed. 1971). Insults and indignities are not enough. See Restatement, §46, Comment d and Dicomes v. Washington, 782 P. 2d 1002, 1013 (Wash., 1989). Embarrassment and humiliation are not enough. See Murphy v. American Home Products Corp., 58 N.Y.S 2d 293, 448 N.E. 2d 86, 461 N.Y.S 2d 232 (1983). The embarrassment, humiliation and indignity suffered by disabled persons at the hands of others are reprehensible. The fact that an individual was diagnosed with HIV and yet the diagnosis was never explained to him is appalling. The fact that a woman had to endure childbirth cut off from all effective communication is distressing. However, the Court cannot simply look to the unfair and upsetting sequelae of defendant's actions or omissions: it must view them in light of the standards imposed upon a plaintiff seeking to file this type of claim. The facts and claims here simply do not support this cause of action under the reported cases, which impose a very high threshold of proof. Accordingly, partial summary judgment is granted in favor of the defendant as to Counts two and Three.

The second issue presented is defendant's argument that plaintiffs' claims under the ADA and the Rehabilitation Act concerning incidents prior to June 26, 1993, must be dismissed as a matter of law because plaintiffs failed to file their claims within the two-year statute of limitations.

Plaintiffs have the burden of showing that defendant's acts constitute a continuing violation. The acts must constitute more than an isolated occurrence or a few sporadic acts. See United Air Lines, Inc. v. Evans, 431 U.S. 553, 557 (1977). Plaintiffs must be able to identify the policy or practice which led to the discrimination and provide some factual support for the claim. Porta v. Rollins Environmental Services (NJ) Inc., 654 F. Supp. 1275, 1281 (D.N.J. 1987) and Bronze Shields Inc. v. N.J. Dept. Of Civil Service, 667 F.2d 1974 (3rd Cir. 1981), cert. denied, 458 U.S. 1122 (1982). The sheer number of visits in which plaintiffs, who for the most part, regularly had their medical needs served by JCMC in which no interpreters were available to them demonstrates that there was a policy or at least a practice not to have arrangements in place to provide the necessary communication.

Plaintiffs allege that over at least a ten year period, and over the course of 356 visits for treatment, they were denied services. Plaintiff Pettiford was treated for three pregnancies, including a Cesarean section, as well as numerous emergency room visits and clinic visits and was never afforded an interpreter. Plaintiff Hickson also was treated for a variety of reasons at JCMC from 1987 to the present and was never provided with an effective means of communication. Plaintiff Schrieber is similarly

situated. Finally, plaintiff Williams was treated from birth to present, including having been diagnosed HIV-positive, but never had the basic implications of his condition explained to him until after the lawsuit was filed.

Plaintiffs have factually and legally met their burden at this stage of establishing that there were discriminatory acts occurring withing the statue of limitations. There were numerous times alleged between June 1993 and June 1995 when they were not provided with interpreters. They have met their burden of establishing that defendant's failure to provide these services was intentional, as opposed to accidental or unknowing. Finally, they have met their burden of showing that the failure to provide interpreters over the ten year course of treatment was a policy of the defendant.

The events all allege the same violation: failure to provide interpreters or other effective means of communication for these deaf plaintiffs. Therefore, the prior acts " . . . are not isolated and unrelated events, but may have been part of a . . . policy of discrimination." Porta, supra, 654 F. Supp. at 1281. Each of these prior acts go beyond that which can be characterized as " . . . merely an unfortunate event in history which has no present legal consequences." United Air Lines, Inc., supra, 431 U.S. at 557 (1977). These alleged acts, if proven, are compensable.

Accordingly, the motion for partial summary judgment on statute of limitations grounds is denied.


                                    Very truly yours,

                                    Patricia K. Costello

                                    Patricia K. Costello, J.S.C.


PKC/ksd

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION, CIVIL PART
MIDDLESEX COUNTY DOCKET NO. L-00334-96
A.D.≠

| | | |
|---|---|---|
| GINA BUSANIC, | ) | |
| | ) | |
| Plaintiff, | ) | TRANSCRIPT |
| | ) | OF |
| vs. | ) | MOTION |
| | ) | |
| RARITAN BAY MEDICAL CENTER, | ) | |
| | ) | |
| Defendant. | ) | |

Place:  Middlesex County Courthouse
        1 John F. Kennedy Square
        New Brunswick, NJ 08903

Date:   October 2, 1998

BEFORE:

    HON. MARK B. EPSTEIN, J.S.C.

TRANSCRIPT ORDERED BY:

    CLARA R. SMIT, ESQ. (Clara R. Smit, Esq.)

APPEARANCES:

    CLARA R. SMIT, ESQ.
    Attorney for the Plaintiff

    CELIA BOSCO, ESQ., (Genova, Burns & Vernoia)
    Attorney for the Defendant

                Karen Myers, Transcriber
                COLE TRANSCRIPTION AND RECORDING SERVICE
                Certified Court Transcribers
                4 ROBBINS STREET
                TOMS RIVER, NEW JERSEY 08753

                Audio Recorded
                Audio Operator, Dawn Paccillo

Colloquy

1   intentional just by virtue of the fact that you have to act

2   do something.

3            THE COURT:  You almost want malice.  You're --

4            MS. BOSCO:  I would say --

5            THE COURT:  -- almost saying you have to get to an

6   evil purpose.

7            MS. BOSCO:  -- something along those lines.  Well,

8   not evil, but yes, I would say for the purposes of this line

9   of cases dealing with the damages component, yes.  I

10  absolutely agree and I think, again, it supports the basis o

11  my other aspects of my motion that you don't have to show

12  intent at all and, in fact, it's irrelevant on the issue of

13  whether accommodations have been provided or not.  But with:

14  the meaning of these cases of damages, that's the type of

15  intentional discrimination that the courts are talking about

16           THE COURT:  All right, a couple of other issues th

17  are, that are addressed are whether or not the statute of

18  limitations bars the action prior to December 14th and if it

19  does, barring any evidence of treatment prior to December _

20  14th.  Again, I understand your argument there is that, your

21  argument's a strict argument as to timing, and your argument

22  is it's a continuing violation in most cases.  Is there

23  anything additional you want to add along those lines?

24           MS. BOSCO:  I would just make the statement that :

25  the court were to allow the claims dating back to 1991 to be

**Colloquy**

1  included, that it would provide no incentive for litigants

2  present their claims in a timely way.  And it will also alm

3  be an encouragement for them to accumulate claims, to conti

4  to visit hospitals over seven, eight, nine years and then s

5  at the end of that period of time, and then their damages a

6  enormous.  I think that we can lose site of the fact that

7  statutes of limitations are designed to provide a measure o

8  repose to defendants as well in terms of, let's assume that

9  the hospital was not aware that it was not complying with th

10  law, that it should be, the litigant should be forced to

11  pursue those claims when they're aware of them.  And there's

12  no evidence in this case that this plaintiff wasn't aware th

13  she had a claim; she just chose not to file.

14          MS. SMIT:  Well, Your Honor, the defendant's

15  argument is horrible.  What you're saying is basically the

16  hospital can keep doing it, the hospital can keep doing it a

17  long as the plaintiff doesn't collect up these, she should,

18  you know, be forced to do it, the hospital shouldn't keep

19  doing it to give the plaintiff the reason to keep, to have a

20  these claims.  In other words, it's not the plaintiff that's

21  discriminating against herself, it's the hospital.  The

22  hospital's not providing an interpreter; they're the ones th

23  keep doing it over a time period.  So you're blaming the

24  plaintiff for having waited, but the hospital doesn't have t

25  keep doing it.  The hospital could have provided interpreter

Colloquy

1    years ago.

2           The continued violation period is very apropos for

3    this case.  What happens is the only case the defendant can

4    really cite to is <u>Galloway</u> which is a Seventh Circuit 1996

5    decision.  In <u>Galloway</u> the court, the holding of that court

6    was not that the continued violation period did not apply, i

7    fact they found it did apply.  Their holding was that it was

8    not gender related, so therefore, they were going to toss th

9    plaintiff's claim.  But what they found was the fact that sh

10   had been called a bitch on several occasions, but not daily

11   would, in fact, be a continued violation, that she could bri

12   them in.  I would submit the same thing would be true with

13   Miss Busanic.  She goes to an emergency room, she doesn't ge

14   an interpreter.

15          Years ago she didn't know, even if there was a cau

16   of action, I have to admit most deaf people in New Jersey

17   didn't know, most hearing deaf (sic) people didn't know that

18   there was a cause of action for that.  I really started

19   bringing these cases a few years ago.  There would be no ⁻

20   reason for her to even think about it.

21          In addition, the slight to her was a lot.  It was

22   emergency room visit, but it was not so much that she would

23   actually think that maybe she should go out and sue.  Now,

24   even though this happens time and time again, and she's only

25   been there about maybe two or three times in the emergency

Colloquy

1   room, it's only when she becomes pregnant that she realizes

2   that there is a problem.  Now, when she actually goes in for

3   the labor and delivery, that's the most significant event fo

4   her, and for her not to have an interpreter, not to be able

5   understand what's going on during that time period, is the

6   catalyst that moves her to actually file a suit.  All of the

7   other acts are just part and parcel of the same pattern and

8   practice that she's experienced at the hospital.

9         THE COURT:  And I think finally, no not finally, b

10  there's also an argument that the intentional emotional

11  distress and outrageous conduct should be dismissed.  And

12  there you argue that here some type of activity which is so

13  outrageous and conduct so extreme to go beyond the bounds of

14  human decency, to which nobody should be subjected to, or so

15  severe that no reasonable person can be expected to endure i

16  When I was considering this question in my mind, and Miss Sm

17  just pointed out, people didn't even know they had this caus

18  of action until rather recently.  Without this statute no

19  cases were ever brought for this outrageous behavior.  How

20  outrageous, and I don't mean to minimize the behavior --

21        MS. SMIT:  I think it's pretty outrageous.

22        THE COURT:  -- but how outrageous can it be if we

23  need a statute to --

24        MS. SMIT:  To correct the situation?

25        THE COURT:  -- require it because probably there w

Colloquy

1   no common law cause of action.  Up until the statute you

2   couldn't even sue for this, could you?

3              MS. SMIT:  Yeah but, Your Honor, I would submit --

4              THE COURT:  I mean you could sue for it, but you

5   probably wouldn't have been successful because chances are

6   people would say well, there's no duty.

7              MS. SMIT:  Right.

8              THE COURT:  And if there's no duty then how could

9   civilization be totally outraged, violated if you need a

10  statute.  And what we're really talking about is a statutory

11  violation to correct behavior that apparently was not

12  considered to be even a tort until the statute.

13             MS. SMIT:  It's kind of like, you know, I tell my

14  kids, just because someone doesn't catch you, it doesn't mea

15  it's not wrong, you know.  I mean, I think if you're doing

16  something --

17             THE COURT:  I'm not saying it's not wrong, I'm

18  saying, but we're talking in the type of language that says

19  that it goes beyond all possible bounds of human decency.

20  Now --

21             MS. SMIT:  I think it does.  I think the fact that

22  somebody goes into the hospital and you can't communicate wi

23  them, they don't understand what you're saying, you don't

24  understand what they're saying, you're giving birth to a bab

25  and the situation of giving birth to a baby is probably the

**Colloquy**

1   worst situation a deaf person can endure in a hospital and n

2   understand, although we had some other situations that are

3   similar to it.

4           THE COURT:  I'm trying to think of some others, I'

5   thinking of abused women, for example, who needed statutes i

6   order to protect battered spouses.  On the other hand, it

7   always was not only a tort, but a crime, to hit another

8   person, whether it be your spouse or anybody else.  It was

9   weak then, perhaps, in the past, but it was always a crime.

10  But it was never even a tort to not provide an interpreter t

11  a deaf person, so how could that be considered to be --

12          MS. SMIT:  Just because our society takes a while

13  get to the point where they say we're going to actually pass

14  the statute, I mean the same thing with the Civil Rights Act

15  people were, you know, the black race, or African/American

16  race, the same thing.  I mean just because it's not there an

17  there's no law that say you can't do it doesn't mean it's no

18  wrong.  I don't know that our laws are always so quick to

19  catch up --

20          THE COURT:  But remember, we're not talking --

21          MS. SMIT:  -- with the morales of our society --

22          THE COURT:  We're not talking about not wrong, we'

23  talking about, again, beyond all possible bounds of human

24  decency --

25          MS. SMIT:  Right.  I don't know that our society i

Colloquy

1    so quick though.

2            THE COURT:  -- which is really extreme.

3            MS. SMIT:  I mean what you're saying is because

4    there's not a statute then, perhaps, it wasn't so outrageous

5    that our society would consider it to be outrageous.

6            THE COURT:  Right.

7            MS. SMIT:  What I'm saying is just because our law

8    take a while to catch up with the morales of society, I mean

9    it's not always there.  You know, just because we finally en

10   up doing the right thing doesn't mean that it's not

11   outrageous.

12           THE COURT:  Right, but this is related with the

13   language that generally talks about this type of behavior.

14   talks about what's utterly intolerable in a civilized societ

15   and not the, what a civilized society, perhaps, should be, b

16   what our civilized society expects.

17           MS. SMIT:  Well, now it is considered to be

18   intolerable though; now there is a statute.

19           THE COURT:  So you're saying, your argument is now

20   that there's a statute it is utterly intolerable in a

21   civilized society.

22           MS. SMIT:  Well, I don't know if I'm saying that; I

23   think it always has been.

24           THE COURT:  It always was, but certainly now.

25           MS. SMIT:  But, yeah, certainly now.  And. . .

<div align="center">Colloquy</div>

1       THE COURT:  Okay.

2       MS. BOSCO:  Judge, I just want to comment that I

3  think that the plaintiff's attorney wants the court to infer

4  from the denial of accommodations this outrageous, unciviliz

5  conduct, and I think in addition to looking at the, or

6  engaging in the statutory analysis that you just did, you ne

7  to look at the facts.  And the facts as admitted by the

8  plaintiff, not the defendant's characterization, doesn't giv

9  rise remotely to the kind of behavior that would be deemed s

10  utterly atrocious or egregious that it's uncivilized.  I mea

11  the plaintiff herself admitted that people made efforts to

12  communicate with her.  And now, whether you deem that to be

13  actionable is different from whether or not it's so

14  intolerable.

15       Her boyfriend, who is a native sign language

16  interpreter, and of course plaintiff takes the position he w

17  not qualified to interpret, but he was there.  She was not

18  left alone on a table, and nobody ever tried to communicate

19  with her, and nobody was there to help her; her mother was

20  there for part of the time.  These are just not the facts th

21  even remotely resemble this type of tort.  And I would just

22  rely on our papers for the rest.

23       THE COURT:  And I think now the final applications

24  is to bar testimony and evidence of non-party witnesses.  An

25  these are generally other deaf people who were treated at th

Colloquy

1  hospital?

2       MS. SMIT:  Yes.

3       THE COURT:  And who will testify as to the same

4  general pattern of behavior?

5       MS. SMIT:  Yes.

6       THE COURT:  And why isn't that permitted under,

7  especially some of the sexual discrimination cases?

8       MS. BOSCO:  Well, those cases, I think, are

9  distinguishable because in those cases showing an intent to

10  discriminate is an essential element of that claim.  It show:

11  they're disparate treatment cases when you need to show that

12  In a denial of reasonable accommodations you don't need to

13  show that, and that's what we were just discussing before.

14       THE COURT:  You say you do need to show.

15       MS. BOSCO:  No I don't, it's not a requirement und

16  the law that you show a pattern and policy of discrimination

17       THE COURT:  You need to show intent, you say --

18       MS. BOSCO:  You need to show intent, you don't nee

19  to show a pattern and policy of discrimination.

20       THE COURT:  Wouldn't that be evidence of intent if

21  you keep doing it over, and over, and over again?

22       MS. BOSCO:  I don't think it adds anything to the

23  proofs that the plaintiff has to set forth to prove her clai

24  in this case.  All it does is it prejudices the defendant.

25  It's the classic parade of witnesses before the jury.  Ten

**Colloquy**

1   people getting up and saying I was treated, I didn't get thi

2   I didn't that.  And then the defendant is now put to the tas

3   of basically having to --

4            THE COURT:  Try ten cases.

5            MS. BOSCO:  -- to try ten cases.

6            THE COURT:  But wouldn't it also be under a patter

7   and custom exception if you did have ten cases exactly the

8   same?  I realize in an automobile accident where a person go

9   through a red light, normally you can't go in and say well,

10  I've seen him go through a red light before.  But if you had

11  this, if you had a person who happens to be on the corner

12  saying that guy blows the red light every time, I think he

13  might have a pattern and custom --

14           MS. BOSCO:  Well, I think that habit or custom

15  testimony can be excluded on the basis of prejudice.

16           THE COURT:  Yeah.

17           MS. BOSCO:  And, clearly, we argued that that woul

18  be the case here.  But there's not even a threshold showing

19  the plaintiff that the testimony would be sufficiently simil

20  that it would fit within a habit or custom rubric.

21           THE COURT:  Well, we don't know, we don't know unt

22  the, my understanding is these are people, the only thing I

23  notice, the allegation, these are people who encounter the

24  same type of problems, they asked for interpreters and they

25  weren't provided.  I guess you're going to have to take thei

Decision

1  depositions to find out.

2      MS. BOSCO:  I think, Judge, that in reasonable

3  accommodations cases they are extremely fact specific, so ev

4  if you theoretically could show that there was a policy to

5  deny somebody accommodations, that doesn't mean that any

6  particular plaintiff was on a particular case because they

7  might not have asked for it.  They might be able to read lip

8  They, it depends on what their needs were.  So, it becomes,

9  those issues militate against allowing that in this habit

10  evidence because then it hopelessly confuses the issues, it

11  protracts the litigation, and I just think on balance it's n

12  necessary for the plaintiff to prove her case.

13      THE COURT:  Right.

14      MS. BOSCO:  All it does is prejudice.

15      THE COURT:  Well, now you've made your argument.

16      MS. SMIT:  Excuse me.

17      THE COURT:  That made your argument, right?

18      MS. SMIT:  Yeah.

19      THE COURT:  Let me go to the one the defense is

20  going to win first; that is the allegation, the motion

21  dismissing the, I think it's the second and third count of

22  defendants and plaintiffs, which alleges intentional

23  infliction of emotional distress and outrageous conduct for

24  the reasons I discussed.  I just think that this cannot

25  prevail given the burden the plaintiffs have to prove, again,

Decision

1   dealing with conduct that goes beyond all possible bounds of

2   human decency and utterly intolerable in a civilized

3   community.  And I just don't think that the facts which are

4   alleged in this case rise to that level, for the reasons I

5   discussed during oral argument.  I've already ruled with

6   regard to the subpoenas.  I believe that the, I ruled that t

7   claims of the plaintiff prior to December 14, 1993 are not

8   barred because of the continuing violation theory, which, an

9   because of the allegations of an ongoing practice or pattern

10  of discrimination.  And it appears to be the case of Barry v

11  Board of Supervisors, (phonetic) Fifth Circuit, essentially

12  contained the elements which I believe are present in this

13  case, or at least argued to be present in this case.

14       And I will also, of course, not bar evidence of

15  those claims, even if it's determined that her claims are

16  barred by, before December 14, 1993.  I will also rule that

17  even if they were barred the activity and the allegations th

18  she makes concerning that time period would be admissible fo

19  her cause of action post December 14, 1993.  And the, I thin

20  as I've said, I've already ruled in a previous motion, I don

21  recall the date but I think it was some time in January of

22  '98.

23            MS. SMITH:  I think it was February 7th.

24            THE COURT:  February, '98, that I ruled that there

25  could be punitive damages under the Rehabilitation Act and

*State of Florida*

# Florida Commission on Human Relations

*An Equal Opportunity Employer • Affirmative Action Employer*



**Jeb Bush**
*Governor*

**COMMISSIONERS**

**Rita Barreto Craig, Chair**
*Palm Beach Gardens*

**Roosevelt Paige, Vice Chair**
*Orange Park*

**Gayle Cannon**
*Lake City*

**John Corbett**
*West Palm Beach*

**Donna Elam**
*Thanotosassa*

**George Farrell**
*Sierra Verde*

**Leonie Hermantin**
*Miami*

**Juan Montes**
*Miami*

**Keith A. Roberts**
*Dania Beach*

**Aletta Shutes**
*Tallahassee*

**Billy Whitefox Stall**
*Panama City*

**P. C. Wu**
*Pensacola*

**Derick Daniel**
*Executive Director*

FCHR CASE NO.: 21-02534

STEVE LARSEN          Complainant
c/o Matthew W. Dietz, Esquire
Brickell Bayview Center, Ste 1920
80 Southwest 8th Avenue
Miami, Florida 33130

CARNIVAL CRUISE LINES      Respondent
M/S ECSTASY
c/o Hunton & Williams
Emilia A. Quesada, Esquire
Barclays Financial Center
1111 Brickell Avenue, Suite 2500
Miami, Florida 33131-3126

## DETERMINATION – CAUSE

On June 21, 2001, STEVE LARSEN, Complainant, filed a Public Accommodation Charge of Discrimination with the Florida Commission on Human Relations ("Commission") alleging that CARNIVAL CRUISE LINES, M/S ECSTASY, Respondent, discriminated against him on the basis of his disability in violation of Title III of the Americans with Disabilities Act of 1990 (ADA) and the Florida Civil Rights Act of 1992, §§760.01-760.11 and §509.092, *Florida Statutes* (2000). An investigation of this matter has been concluded by the Commission's Office of General Counsel, pursuant to Rules 60Y-5.004 and 60Y-10.005, *Florida Administrative Code*.

## FACTS

1. The Complainant is a paraplegic who is confined to a motorized wheelchair. As a result of his paraplegia, he suffers from pulmonary disease, sleep apnea, and depression. His wife, a licensed nurse, is his caregiver.

2. On January 22, 2001, the Complainant and 25 members of his family and friends boarded the Respondent's cruise ship.

3. The Complainant alleged that he complied with the steps outlined by the Respondent with respect to making a reservation and securing accommodations for his disability.

325 John Knox Road • Suite 240 • Building F • Tallahassee, Florida 32303-4149
(850) 488-7082 • 1-800-342-8170 (Complaints Only, Voice or TDD)
Investigation Fax (850) 488-5291 • Administration Fax (850) 922-3026
Web Site http://fchr.state.fl.us



4. The Complainant's allegations of discrimination based on disability by the Respondent's employees include, but not limited to, the following:

prior to boarding the ship, the Complainant was segregated from the able-bodied members of his party because of his disability;

the Respondent denied the Complainant's and his wife's request to personally carry his medical equipment on board, which resulted in irreparable damage to the equipment because its mishandling by the Respondent's employees, thus rendering the equipment unusable;

the Complainant's wife, who is his caregiver, was not allowed to remain with him while he boarded the ship;

the Respondent did not provide a wheelchair-accessible bathroom to the Complainant for the seven hours he was in their custody;

the Respondent did not provide a wheelchair-accessible cabin to the Complainant; the assigned cabin was inaccessible to him because there was no space to maneuver his wheelchair in either the cabin or the bathroom;

the Complainant was forced to undergo a medical examination by the ship's doctor; and

the Complainant and his wife were forced to disembark because he presented a medical liability to the Respondent even though the ship's doctor allegedly authorized him to remain on board for the cruise.

5. The Respondent refutes the allegations set forth by the Complainant. According to the Respondent, its doctor determined that it was medically necessary to disembark the Complainant and his caregiver to ensure the Complainant's health and welfare.

## ANALYSIS

6. The Complaint of Discrimination was filed in a timely manner pursuant to §760.11(1), *Florida Statutes* (2000).

7. The Commission has jurisdiction as the Complaint of Discrimination alleges discrimination based on physical disability. Any person aggrieved by a violation of §§760.01-760.10, *Florida Statutes* (2000), may file an administrative complaint with the Commission. The Commission shall then investigate the allegations in the complaint and within 180 days of the filing issue a determination if there is reasonable cause to believe that a discriminatory practice has occurred in violation of the Florida Civil Rights Act.

2

8.  Courts construe the Florida Civil Rights Act in conformity with the federal Americans with Disabilities Act and apply federal case law when dealing with these claims. *McCaw Cellular Communications of Florida, Inc. v. Kwiatek,* App. 4 Dist., 763 So.2d 1063 (1999); *King v. Auto, Truck, Indus. Parts and Supply, Inc.,* N.D.Fla. 1998, 21 F.Supp.2d 1370.

9.  The ADA prohibits discrimination "on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation." 42 U.S.C.A. §12182(a). The Respondent's cruise ship is a "place of public accommodation" for purposes of Title III of Americans with Disabilities Act of 1990, §301 et seq., 42 U.S.C.A. §12181 et seq. See, *Stevens v. Premier Cruises, Inc.,* 215 F.3d 1237 (11thCir. 2000).

10.  The Complainant has proven that he is a member of a protected class under the ADA in that his disability substantially limits a major life activity, i.e. walking. 42 U.S.C.A. §12102 (2)(A).

11. The Complainant has demonstrated a *prima facie* case of discrimination by requesting that the Respondent provide reasonable accommodations for the Complainant's known handicap, yet the Respondent failed to provide such reasonable accommodations and the Complainant was prohibited from enjoying the services and facilities. §760.23(8)(c), *Florida Statutes* (2000).

## CONCLUSION

12. The Office of General Counsel has reviewed the case file and determined that the proper resolution of the case is the issuance of a determination of cause on the charge of discrimination based on disability.

13. Pursuant to the authority delegated to me by Rules 60Y-2.004 (2)(e) and 60Y-5.004, *Florida Administrative Code,* it is my determination that reasonable cause does exist to believe that an unlawful discrimination by a public accommodation has occurred.

DATED: December 21, 01, 2001

Derick Daniel
EXECUTIVE DIRECTOR
Florida Commission on Human Relations

FILED: December 21, 2001

By: Denise Crawford, 2001
Denise Crawford
Clerk of the Commission

3



# Florida Commission on Human Relations

An Equal Opportunity Employer • Affirmative Action Employer

Jeb Bush
Governor

**COMMISSIONERS**

Kim Berman Craig, Chair
Palm Beach Gardens

Roosevelt Paige, Vice Chair
Orange Park

Gayle Cannon
Lake City

John Corbett
West Palm Beach

Donna Elam
Thonotosassa

George Farrell
Tierra Verde

Leonie Hermantin
Miami

Juan Montes
Miami

Keith A. Roberts
Dania Beach

Aletta Shutes
Tallahassee

Billy Whitaker Stall
Panama City

P. C. Wu
Pensacola

Derick Daniel
Executive Director

February 11, 2002

Mr. Franklin Zavala
c/o Matthew W. Dietz, Esquire
Brickell Bayview Centre, Suite 1920
80 Southwest 8th Avenue
Miami, Florida 33130

Re: FCHR No. 2200967

Dear Mr. Zavala:

The Commission is in receipt of your letter dated January 22, 2002. You take issue with the Commission's January 17, 2002 finding that the establishment identified in your allegations is not within the Commission's jurisdiction.

My review of your complaint, including your attorney's letter reveals no information to suggest a different conclusion in regards to the jurisdiction of the Commission. The authority given to the Commission to investigate complaints is in the *Florida Civil Rights Act of 1992*, Chapter 760. The Commission has jurisdiction over discrimination in employment, housing, and public accommodations cases, as well as whistle-blower cases. The extent of the Commission's jurisdiction in public accommodations cases is that which is set out in Section 509.092, *Florida Statutes*. Section 509.092, *Florida Statutes*, limits its applicability to public lodging and public food service establishments. You have not made an allegation that you were discriminated against by a public lodging establishment or a public food service establishment.

Section 760.07, *Florida Statues*, does not enlarge the Commission's jurisdiction. That provision merely provides that if one seeks judicial relief for unlawful discrimination in any forum because of race, color, religion, gender, national origin, age, handicap and/or marital status in the areas of education, employment, housing or public accommodations, the litigant may take advantage of the relief provisions afforded under Section 760.11(5), *Florida Statute* (i.e. compensatory and punitive damages). That provision does not give the Commission authority to investigate and make findings of reasonable cause in areas not mentioned in Section 760.10, *Florida Statutes*, or Section 509.092, *Florida Statues*.

The Florida Legislature considered a bill during the 2001 Legislative Session that would have expanded the meaning of a public accommodation, which definition would have included the type of facility where you experienced such an unfortunate incident. Unfortunately, that bill did not get passed. Until such a bill becomes law in Florida, the

Page 2
February 11, 2002
Re: Zavala v. Parkway Regional Medical Center, FCHR No. 2200967

Commission does not have jurisdiction over the type of facility in question. As such, the Commission will take no further action on your complaint.

You have the right to seek judicial review of this decision. The Commission and the appropriate District Court of Appeal must receive your *Notice Of Appeal* within <u>30 days</u> of the rendition of this letter. Explanation of the right to appeal is found in section 120.68, *Florida Statutes*, and in the *Florida Rules of Appellate Procedure*, Rule 9.110.

Sincerely,

Derick Daniel
Executive Director

DD/md